THE DUBUQUE AND PACIFIC RAILROAD COMPANY, PLAINTIFFS IN
ERROR, *v.* EDWIN C. LITCHFIELD.

On the 8th of August, 1846, a grant of land was made to the Territory of Iowa,
for the purpose of aiding said Territory to improve the navigation of the Des
Moines river, from its mouth to the Raccoon fork, in said Territory, one
equal moiety, in alternate sections, of the public lands (remaining unsold and
not otherwise disposed of, encumbered, or appropriated) in a strip five miles
in width on each side of said river, to be selected within said Territory by an
agent to be appointed by the Governor thereof, subject to the approval of the
Secretary of the Treasury of the United States.

On the 15th of May, 1856, Congress passed an act granting to the State of Iowa,
for the purpose of aiding in the construction of a railroad from Dubuque to
a point on the Missouri near Sioux city, every alternate section of land, desig-
nated by odd numbers, for six sections in width on each side of said road.
The State of Iowa regranted the lands to the Dubuque and Pacific Railroad
Company.

The land in question is claimed under these two acts by the parties respectively.

The title held under the act of 1846 must prevail, provided the grant extended
to lands above the Raccoon fork.

This court has jurisdiction to construe this act in the case now before it, the
proceedings before the Executive department, extending through more than
ten years, not being sufficient either to conclude the title or to control the
construction of the act.

Those proceedings stated.

The grant was confined to lands between the mouth of Des Moines river and
Raccoon fork; that was the river to be improved, on each side of which the
strip of land granted was to lie. The historical circumstances connected with
the grant sustain this view.

All grants of this description are strictly construed against the grantees; noth-
ing passes but what is conveyed in clear and explicit language; and as the
rights here claimed are derived entirely from the act of Congress, the dona-
tion stands on the same footing of a grant by the public to a private com-
pany, the terms of which must be plainly expressed in the statute; and if
not thus expressed, they cannot be implied.

The claimant, under the act of 1846, cannot be considered as an innocent pur-
chaser. The act of Congress was a grant to Iowa of an undivided moiety of
the lands below Raccoon fork, and the officers of the Executive department
had no further authority than to make partition of those lands. Having ex-
tended their acts to lands lying outside of the boundaries, their attempts to
make partition were merely nugatory.

The court is satisfied, from evidence before it, that this is not merely a fictitious
action.

THIS case was brought up by writ of error from the **District** Court of the United States for the district of Iowa.

In order that the reader may the more readily understand the question involved, he is requested to make a quasi map for himself according to the following directions: Take a page of paper, upon the eastern and western sides of which draw two lines from north to south, the former representing the Mississippi and the latter the Missouri rivers. Then draw four parallel lines, equi-distant from each other, from east to west, calling the southern the State line, the next above it the "first correction line," the third the "second correction line," and the fourth the "north boundary of Iowa." Then draw a diagonal line from the northwest to the southeast corner, which may be supposed to represent the Des Moines river. From the southeast corner, make a dotted line on each side of, and at a small distance from, the diagonal line, as far as the intersection with the first correctional line, at which is the Raccoon fork. The space included within these dotted lines is conceded to have been granted by the act of 1846. Continue these dotted lines to the second correctional line, and the space thus included will cover lands which have been conditionally certified by the United States, and which are also claimed under the construction of the grant of 1846, as contended for by the counsel of Litchfield, the defendant in error Continuing still further the dotted lines to the boundary, they will include the land which the same construction would give to the claimants under the act of 1846, who contended for the right of running up the river from its mouth upon both sides of it.

Now draw two dotted lines from east to west on each side of the second correctional line, which will include the grant to the Dubuque and Pacific Railroad Company; and within the space where these dotted lines clash, was the land in dispute, viz: section one, in township eighty-eight north, range twenty-nine west of the fifth principal meridian. It was conceded, in the argument, that Litchfield, who brought the suit, was entitled to recover, if the grant of 1846 ran up the river above the Raccoon fork. The claim of the railroad company was.

that the grant did not extend above that point; in which case, their title to the section in controversy was undoubted. There was an agreed statement of facts in the court below, which covered upwards of forty pages of the record. The court decided that the right to the land claimed was in the plaintiff; from which decision the railroad company brought the case up to this court.

It was submitted on printed arguments by *Mr. Platt Smith* for the plaintiff in error, and by *Mr. Charles Mason* for the defendant. The Attorney General (*Mr. Black*) intervened on behalf of the United States, upon the ground that if the grant stopped at the Raccoon fork, it would give away 321,000 acres; whereas, if it were extended up the river, it would take 800,000 acres more, nearly all of which belonged to the United States.

The Attorney General also made the following points, viz:

1. This is a fictitious suit brought here, not to determine the rights of the nominal parties, nor to settle any real dispute between them, but to get an opinion which will throw the moral influence of this court against the Government in a matter already decided by the Executive. Therefore, the case ought to be dismissed.

2. Assuming that an actual dispute exists between the parties, they have agreed upon a statement of facts, which is, in some respects, palpably erroneous and unjust, and in others so defective that no judgment can safely be pronounced upon it.

3. If the court feel bound in such a case to give an opinion, it will be neither necessary nor proper to pronounce upon the construction of the Des Moines river grant. The rights of the parties to the section in suit depend on the conveyances which were made to them by the State of Iowa.

4. The true interpretation of the Des Moines river grant confines it to that part of the river which lies below the Raccoon fork, as the proper department of the Government has decided.

Each one of these points was elaborately argued by the Attorney General. Upon the three first of them, *Mr. Platt Smith*, who was counsel for the defendants below, felt himself called upon to reply, which he did as follows :

These charges are embraced in a great number of insinuations and innuendoes in different parts of the Attorney General's argument. He charges that the agreed statement is "entirely one-sided;" that the defendant's side of the case occupies only the fourth of a page, while the plaintiff's side covers forty-two pages. He says, "It is impossible to understand how such a statement could have been assented to, unless both parties were at least willing that the plaintiff's side should prevail." Again, "It is inexcusable to stuff it with ex parte affidavits and unauthorized certificates of outsiders, which no court can lawfully listen to or suffer to be intruded on its notice. When matter thus grossly inadmissible is put in, and all of it is manifestly for the benefit of one side, it is easy to see that the party on the other side is not making opposition in good faith." The court will please recollect that this is an action of right to try title to real estate ; that it is the business of the plaintiff to make out his case ; that he must depend on the strength of his own title ; and therefore that the introduction of forty-two pages of stuff "which no court can lawfully listen to" may, in that sense of the term, be considered one-sided, as charged by the Attorney General. Although "all of it is manifestly for the benefit of one side," yet I am entirely willing that that side may make the most of it, and neither the Attorney General nor any one else has the right to impugn my motives or faith for not claiming an interest in the stuff, or stuffing the record with an equal amount of the same sort for my own benefit. The court will presume that I knew, as well as the Attorney General, that the court could discriminate between the solid matter and the stuff, and that, if no court could listen to it, there was no danger of losing the case by it ; in fact, the Attorney General is not much frightened about this point himself. In speaking of this kind of evidence, farther along in his argument, he says, "I cannot say for myself that I fear the effect upon your minds of such

affidavits as those of Mr. Sample or Mr. Belknap, or the certificate of Mr. Guy Wells; but when a court receives and reads such things, those who know not what manner of men judges are, might readily suppose the decision to be affected by them more or less." Now, I suppose that the Attorney General imagined that I was one of those persons who did not know what manner of men judges are, and therefore that I supposed they would listen to and be influenced by this stuff. I claim to know, as well as the Attorney General, that the court will only be governed by facts which are really pertinent to the case. The plaintiff's counsel in the action in the District Court, I believe, in good faith supposed that what the Attorney General calls stuff had something to do with the case; I must confess that I thought otherwise at the time, and only admitted such facts for what they are worth, and in doing this I only did what is quite common. I think that a majority of the facts contained in the records of the cases tried in the Supreme Court of the United States are irrelevant, and might by strict rules have been excluded as stuff. The Attorney General says, "It is impossible not to believe that the minds of the counsel on both sides were directed by their clients exclusively to the one subject of the claim against the United States;" and again, "It is impossible to understand how such a statement could have been assented to, unless both parties were at least willing that the plaintiff's side should prevail;" and again, "It is impossible that such a judgment could have been entered under such circumstances, unless both parties had expressed a wish that it should be done." He therefore concludes that if these two parties did that thing, it is conclusive evidence that the suit is fictitious; and he might have added, that both attorneys are guilty of conspiring to defraud the Government out of two million dollars worth of land, and ought to have their names stricken from the rolls, and be sent to the penitentiary. But I say, on the contrary, that it is impossible for the court to presume, without any shadow of proof, that the inferences and charges of the Attorney General are true; but the court will presume that the great mass of stuff and irrelevant matter which has been admitted into the record

was admitted as the same kind of stuff usually is, that it was insisted on by one party who was sanguine and hard pushed for evidence, and admitted by the other for the supposed reason that the court would not listen to it or be influenced by it. This, I think, is the only fair inference which the court can draw from these facts. As to the judge of the District Court examining the case and deciding it in one day, I will say that if such appears to be the fact, it is an error. The case was submitted to the district judge, who had it under advisement for several days, though the judgment may have been entered as on the day on which it was submitted. All judgments, I believe, are in contemplation of law presumed to have been entered on the first day of the term, though in fact they may have been decided on several days; yet I am not aware any inference of fraud or conspiracy can be raised from the fact that the case was submitted and judgment rendered the same day.

Upon the fourth point made by the Attorney General, viz: the construction of the grant, which was, in effect, the principal point in the case, the Attorney General argued as follows:

IV. While I confess to some anxiety that this court, for the sake of example, should dismiss the case without giving any opinion about the construction of the Des Moines grant, it shall not be said that I am unwilling to meet the point if you shall think that it fairly and necessarily arises. I have no fears that your opinion will be opposed to that of the department. I will not argue it upon affidavits, nor waste words in reply to what has been said about the desire of parties interested in the claim to get more land than the Government thought them entitled to. I am very willing to admit that they want a great deal more than they got. But the question to be settled is, how much they have a right to receive.

The simple and naked question presented to the Interior Department was on the construction of the first section of the act of 1846, "that there be, and hereby is, granted to the Territory of Iowa, for the purpose of aiding said Territory to improve the navigation of the Des Moines river from its mouth to the Raccoon fork, (so called,) in said Territory, one equal

moiety, in alternate sections, of the public lands, (remaining unsold and not otherwise disposed of, encumbered, or appropriated,) in a strip five miles in width on each side of said river, to be selected within said Territory by an agent or agents to be appointed by the Governor thereof, subject to the approval of the Secretary of the Treasury of the United States."

Does this give to the Territory one moiety of all the lands on both sides of the river up to its source, or is the grant confined to the lands which lie between the fork and the mouth? What is the extent of this grant? How is the strip described within which the alternate sections of land are to be taken? It is described as a strip five miles in width on each side of said river. What river? The said river—the river before mentioned and described—that is, the Des Moines river from its mouth to the Raccoon fork.

There was nothing in the report of the committee, nor in the bill itself, which could have directed the attention of Congress to any lands above the fork, or created a suspicion in the mind of any member that the land above the fork was meant to be included. Indeed, there was nothing in the bill or the report to indicate that there was any river above that fork which was called by the name of the Des Moines. Nor was it true as a geographical fact, that the river above the fork was so called. A map published in 1844, only two years before the date of the law, marks the river as Keosagua or Des Moines only to a point just above the Raccoon fork, beyond which it is called the river of the Sioux. If the phraseology of the statute would make the extent of the grant doubtful under other circumstances, the fact that the river above the fork was not called by the name of Des Moines would show very clearly what must have been the legislative intent when such words were used. It seems, however, that the persons engaged in the improvement of the Des Moines river have changed the name of a part of it; but the alteration of their geography will hardly carry with it a change in an act of Congress.

I admit that this, like every other statute, must be interpret-

*Dubuque and Pacific Railroad Co. v. Litchfield.*

ed *ex visceribus suis*, with the aid of such lights as may be shed upon it by known historical and geographical facts, together with the authority of those officers whose duty it has been to interpret it heretofore. Where Congress has said one thing plainly and distinctly in a law passed and enrolled, it cannot be modified or in any manner changed by proof, however clear, that the committee which reported the bill, or any other member of the body, or even all of them together, meant to say a different thing. But when an obscurely worded law has received a construction at the hands of those who passed it, that construction will not be lightly set aside by any court. So, when an officer, whose duty it is to administer and execute the law, gives an official construction of it, his opinion is entitled to equal respect; and when the persons interested in a different construction have acquiesced in that which the law received from the officers, the conclusion is still more strong and clear against any opposing view. All this has occurred in the present case.

(Then followed an examination of the acts of the executive officer of the Government.)

If the court shall reach this part of the case, and be of opinion that the words of the grant are sufficiently ambiguous to leave the intent of the Legislature in doubt, it will then become necessary to determine what rule of interpretation shall be applied to it. Shall the Government or the grantee have the benefit of the doubt? A more important question to the public treasury and the morals of the people has never been determined in this court. If it be once settled that acts of this kind are to be construed largely in favor of the parties who get them passed, it will take millions every year, in land and money, to satisfy claimants to whom Congress never intended to give thousands. It is not necessary to show our respect for Congress by affecting to be ignorant that legislation like this is generally procured upon the solicitation of parties interested. The public and well-known history of the country proves that land grants have been sometimes carried by means much worse than solicitation. Will you put it into the power of parties to possess themselves of the public domain or the

public money under grants which they themselves have shaped so as to make them unintelligible? That would be throwing the door wide open to the most dangerous and most demoralizing species of fraud. It would be an offer of the most enormous premium to every man whose ingenuity is great enough to practice deception upon Congress. I have no fears that this court will make itself responsible for the consequences which would follow from such a rule.

I do not ask your honors to say that a strained construction in favor of the public right should be put on any statute. Let every grantee have what Congress gives him in words which are tolerably plain to the apprehension of intelligent men. But do not give, by construction, what the grant itself was not understood to convey. There is no hardship in this. When a legislative body means to give anything, the words can easily be found to express that meaning. It does not happen once in a thousand times that the language of a grant construed strictly carries less than the Legislature is willing to bestow.

The general rule is so well established, that to cite the authorities would look like an affectation of case hunting. Public grants must be construed strictly against the grantee. All Governments are obliged to make this a maxim of their jurisprudence; otherwise, they could not protect themselves against the impostures which would be continually practiced on their officers and agents. Is there anything in a land grant made by Congress for the benefit of a local improvement which should take it out of the rule? No. Of all public grants, these should be looked after with the greatest caution. I trust the court will at least leave them within the principle which governs other grants of a like nature.

But even if you were disposed to repudiate the general rule, or change it so as to give a public grantee the benefit of a reasonable doubt, what could he take by such a doubt as this?—a doubt which has no countenance in the law itself—a doubt which the authors of the grant never dreamed of—a doubt which did not enter the heads of the grantees themselves until it was suggested by a loosely-written and ill-considered letter from the Land Office—a doubt so dim that it was not seen by

the State of Iowa, nor any of her agents, while they were accepting the law with a construction which confined them to its words—a doubt which was steadily repelled by nearly all the officers of this Goverment, and never entertained by any long enough to be acted on. Doubts may do good service sometimes, but not such doubts as this.

The reporter can only make room for *Mr. Mason's* argument upon the construction of the grant, which was as follows:

We hold that the plain language of the act itself is sufficient to settle this question conclusively in his favor. It grants "one equal moiety in. alternate sections of the public lands, (remaining unsold and not otherwise disposed of, encumbered, or appropriated,) in a strip five miles in width on each side of said river."

It is true that, in defining the object of the grant, the law declares it to be for the purpose of aiding to improve the Des Moines river, from its mouth to the Raccoon fork; and the conclusion is thence drawn by some, that the grant itself was intended to extend no higher than the latter point. But I submit whether such a conclusion can be reached by any sound rule for the interpretation of statutes.

When we speak in general terms of the Des Moines river, we mean the whole river, and not a portion of it. In defining the *purpose* of the grant, a limited portion of the river is expressly mentioned. But in fixing the *limit* of the grant, the river itself is named, without restriction or qualification. How shall it then be said that a part, and not the whole of the river, was intended?

The Des Moines river was, in 1846, a well-known stream Several years previous to that time, a thorough exploration of the country which includes the valley of that river had been made by Mr. Nicollet, under the direction of the Topographical Bureau. The report and map made by him were published by the authority of Congress in 1843, and contained the latest and most authentic information which was in the possession of Congress at the time that this act was passed. In that report, Mr. Nicollet says.

"The Des Moines empties into the Mississippi in 40° 22' latitude N., and its sources, heretofore supposed to be in 43°, are extended on my map to 44° 3' N."

See Senate Document No. 237, of the 2d session 26th Congress, page 23.

The map which accompanied this report represents the river as taking its rise far above the north line of the present State of Iowa, (which is the parallel of 43° 30' N.,) and corresponds with the report.

The report of Mr. McClernand shows that the committee which reported this bill had the report and map of Mr. Nicollet before it, and that their report was made in accordance therewith.

Here, then, we have the source and the mouth of this river definitely fixed. Its whole course is distinctly shown in a report and map prepared by a public officer, and published by the authority of Congress only three years previous to the passage of this act; and with all this information before them, they declare that the grant shall embrace the alternate sections in a strip five miles in width on each side of the river. Is there the least ambiguity or doubt as to their meaning?

In 1856, in an act of Congress granting lands to the State of Iowa, to aid in the construction of certain railroads, the following language is used:

"*Be it enacted, &c.,* That there be, and is hereby, granted to the State of Iowa, for the purpose of aiding in the construction of railroads from Burlington, &c., [specifying four different roads,] every alternate section of land designated by odd numbers, for six sections in width, on each side of said roads."

Statutes at Large, vol. 11, page 9.

Now, it has never been doubted that the land granted by this act extended throughout the whole length of each road, respectively. And yet, the language employed in limiting these grants is substantially the same as that used in fixing the extent of the Des Moines river grant. The alternate sections, for six miles in width on each side of said roads, are granted without declaring that this grant should extend throughout the entire length of each of those roads. The

same rule of construction which has been applied to the railroad grants would render this grant coextensive with the entire river. In fact, there is even a stronger reason for such a construction in this case than in that. The river was a fixed object in nature, mapped out and described before the grant was made. Congress knew, with much more precision, what they were granting, than though they had been appropriating lands for the construction of railroads then unlocated, and the precise length and direction of which they could not foresee.

In such circumstances, when lands within five miles of the Des Moines river are mentioned, who is authorized to say that only those below the Raccoon fork are meant? The Legislature has fixed no such limit. Can the courts prescribe one?

But, by way of heaping measure, and as if to place the matter beyond all reasonable doubt, Congress has fixed another restriction upon the extent of this grant. The land must be selected within the then Territory of Iowa. The first restriction prevented us from taking lands more than five miles from the river; the second confines us within the Territory. On the principle involved in the maxim, " *expressio unius est exclusio alterius,*" each of these restrictions adds strength to the conclusion that there are no other restrictions unexpressed. " As exception strengthens the force of a law in cases not excepted, so, according to Lord Bacon, enumeration weakens it in cases not enumerated."

Dwarris on Statutes, page 605.

In fact, a prohibition of one thing often involves an actual permission to do what is not thus prohibited. Thus, the constitutional provision which prevents Congress from interfering with the slave trade *prior* to 1808 has always been regarded as giving authority to prohibit it *after* that period. In like manner, the limitation which restricts us to the Territory of Iowa, in the selection of lands, is, in effect, an authority to select the alternate sections within five miles of the whole length of the river, wherever such land can be found within any portion of that Territory.

In the construction of a statute, we must endeavor to give a definite meaning to every word and expression found there-

in. The fair and natural import of the terms employed is to govern in construing the law, and where a clear intelligible meaning can be gathered from those terms, we are not to look beyond them to fancy some unexpressed intent.

In Denn *v.* Reid, (11 Peters, 524,) the question turned upon the validity of a deed given for lands to which the Indian title was not extinguished. By an act of the Legislature, deeds of this description were declared valid, provided they were proved by one or more subscribing witnesses thereto, before any one of certain officers mentioned in the act. This deed had not been so proved, but it was acknowledged by the grantor himself before one of these very officers. It was contended that, as an acknowledgment was more conclusive and satisfactory than any proof by subscribing witnesses could possibly be, this deed came within the spirit and intent of the law.

The court admitted that the intention of the Legislature was probably such as was thus contended for, but the language of the statute did not justify such a construction. They say:

"Where the language of an act is not clear, or is of doubtful construction, a court may well look at every part of the statute, as its title, and the mischief intended to be remedied in carrying it into effect. But it is not for the court to say, where the language of the statute is clear, that it shall be so construed as to embrace cases, because no good reason can be assigned why they were excluded from its provisions."

Such is the doctrine adopted by this court, and by a like rule we wish the present case to be determined. We need (as we think) only read this statute, with an unprejudiced wish to arrive at its meaning from the natural import of the language alone, to be satisfied that, for the purpose of aiding to improve the Des Moines river as high up as the Raccoon fork, it was the evident intention of Congress to grant the alternate sections, in a strip five miles in width, on each side of said river, from its mouth to its source, so far as such land could be found within the limits of the then Territory of Iowa.

But it is said that all grants of this nature are obtained upon

the plausible plea that the reserved sections will be doubled in value, which can only be done when the grant is coextensive with the improvement. If that were even generally true, there is reason to believe that the present case was an intended exception. In other cases, where alternate sections are granted to aid in making an improvement, the minimum price of the reserved sections has been doubled. That was not done in the present instance. The natural inference is, that Congress was satisfied that the reserved sections in this case would not be doubled in value, as they lay mostly along the river, far above the improvement.

But it seems to be thought that there is, at least, an impropriety in granting lands for public improvements, except where the property of the Government is to be benefited thereby— that in such cases the lands granted should be along or adjacent to the improvements to be made, or should be coextensive therewith, and that such a practice is so proper, and has become so far the settled policy of the Government, that it will in a great degree control the meaning of the statute. There may be a fitness in such a rule, but has it become a settled policy? Can it change the plain meaning of the statute? Can it make the law?

It is true, that such a rule has in various instances been applied to canal and railroad grants, but I know of no instance in which it has been applied to river improvements, unless the present grant is one.

On the very day upon which this Des Moines river grant was passed, a similar grant was made to Wisconsin, "to aid in the improvement of the Fox and Wisconsin rivers, and to connect the same by a canal." For this purpose there was granted by that law the one-half of three sections in width, "on each side of the said Fox river and the lakes through which it passes from its mouth to the point where the Portage canal shall enter the same, and on each side of said canal from one stream to the other—reserving the alternate sections to the United States—to be selected under the direction of the Governor of said State, and such selection to be approved by the President of the United States."

Statutes at Large, vol. 9, p. 83.

Now, here was a case in which Congress only intended to grant the land along the Fox river just as far as the improvement was to be made, and not to its source. With what precision have they expressed that intent? How different from the language of the Iowa grant, made on the same day!

But it was a grant made for the improvement of the Fox and Wisconsin rivers, and for connecting them by a canal; and still the grant extends only along one of those rivers and the canal which is to connect them, but not along the other river. The supposed policy of the Government in such cases, is as much disregarded by making the grant less in extent than the improvement as by making it greater. The same argument that would limit our grant to the Raccoon fork would extend theirs along the whole length of the Wisconsin river, from the point where the Portage canal shall enter it to its mouth. Would such a construction of that law meet with any favor from the Government or from this court? If an idea of fitness or policy is not permitted to enlarge a grant, will it be allowed to diminish one? Should not the rule be reciprocal?

Again, in 1852, Congress granted seven hundred and fifty thousand acres of land to the State of Michigan for the improvement of the St. Mary's river, by constructing a canal around the rapids therein. These lands were "to be selected in subdivisions, agreeably to the United States surveys, by an agent or agents to be appointed by the Governor of said State, subject to the approval of the Secretary of the Interior, from any lands within said State subject to private entry."

Statutes at Large, vol. 10, p. 35.

Here, also, there was no correspondence in extent between the improvement and the grant. These are the only cases of grants of land for river improvements (except our own) that have fallen under my observation. At all events, they are sufficient to do away with the idea of the supposed established policy as connected with such grants.

It may be said that a departure from this rule was absolutely necessary in the case of the Michigan grant, as the cost was

so great, in proportion to the length of the improvement, that a sufficient amount of land could not otherwise be obtained. The same necessity, though not so great in degree, existed in relation to the Iowa grant, as is proved by the fact shown in the record, that, after having expended all the land below the Raccoon fork, and a still larger amount lying above that point, the work is yet far from being completed.

But, if the circumstances of the case did not amount to a necessity, they at least showed a manifest propriety, of not following the rule suggested. The river was navigable, for a portion of the year, far above the Raccoon fork.

The land along the river would therefore be enhanced in value, by the contemplated improvement, far above its upper terminus. The completion of the improvement to the Raccoon fork would have added greatly to the value of all the land for an indefinite distance above that point; and the Government was acting like a prudent and just proprietor in contributing to that improvement by granting the alternate sections through a limited portion of the region thus benefited.

Again, the land, for thirty or forty miles above the mouth of the Des Moines, was not to contribute an acre to the improvement, though much money was to be expended on that very portion of the river. On the one side of that part of the stream was the State of Missouri, and the land was therefore excluded from being taken by the very terms of the grant; and on the other side was the half-breed tract, in the State of Iowa, and was private property, as will appear from the treaty of 1824 and the act of Congress of June 30, 1834.

See Statutes at Large, vol. 7, p. 229, and vol. 4, p. 470.

Besides, a considerable portion of the land between the half-breed tract and the Raccoon fork had been sold by the United States prior to 1846; so that, at the date of the passage of this law, there was but little more than one-half the amount of land below the Raccoon fork to be affected by the grant, which it would have embraced had the alternate sections throughout this portion of the river been subject to the terms of the grant. There was only three hundred and twenty-one thousand acres left to be transferred to the State,

under this grant below the Raccoon fork; whereas the amount of six sections to the mile, for the whole of that distance, would have composed an aggregate of more than five hundred and eighty-seven thousand acres.

This deficiency of two hundred and sixty-six thousand acres, situated below the Raccoon fork, would probably at that time have been of more value than the whole nine hundred thousand acres, which were, as we contend, granted above that point, and which were to be received in lieu thereof. In railroad grants, it is the custom to allow the alternate sections to be taken for fifteen miles on each side of the road, to make up for any deficiency like the present. Instead of increasing the breadth of the grant for that purpose in this instance, a suitable addition has been made to its length.

Now it might be, from a sense of fitness, that those lands higher up and along the river were taken in place of those which were wanting below, or it might be only an arbitrary way of fixing upon what was deemed a suitable quantity of land, or it might be from some other motive on the part of Congress, that this rule was adopted. Whatever the reason might have been, is wholly immaterial. It is enough that the grant was made in those terms.

What we have been contending for is, that in the construction of this statute the court should confine itself to the language of the law. The principle which has been sanctioned by this court justifies us in insisting upon such a rule. In the case of the Paulina's Cargo *v.* the United States, 7 Cranch, 60, Chief Justice Marshall says:

"In construing these laws, it has been truly stated to be the duty of the court to effect the intention of the Legislature. But this intention is to be searched for in the words which the Legislature has employed to convey it."

And again, in the United States *v.* Fisher, 2 Cranch, 390:

"Where rights are infringed, where fundamental principles are overthrown, where the general principle of the law is departed from, the legislative intention must be expressed with irresistible clearness to induce a court of justice to suppose a design to effect such objects. But where only a political regu-

lation is made, which is inconvenient, if the intention of the Legislature be expressed in terms which are sufficiently intelligible to leave no doubt in the mind where the words are taken in their ordinary sense, it would be going a great way to say that a constrained interpretation must be put upon them to avoid an inconvenience which ought to have been contemplated in the Legislature when the act was passed, and which, in their opinion, was probably overbalanced in the particular advantages it was calculated to produce."

We respectfully submit whether the present is a case which justifies a strained construction of the statute.   Must not something more than a mere inconvenience or a departure from a supposed rule of fitness be necessary to justify a disregard of the ordinary rule of construction in accordance with the fair import of the language used?

Mr. Justice CATRON delivered the opinion of the court.

The land in controversy lies within five miles of the Des Moines river, and within the limits of what was the Iowa Territory when the act of Congress of 1846 was passed, making the grant to improve the navigation of the Des Moines river from its mouth to the Raccoon fork; but the land sued for lies nearly sixty miles above the mouth of that fork.

Litchfield, the plaintiff below, claims by virtue of a title derived from the State of Iowa, acting as trustee of the Des Moines river fund.

The Dubuque and Pacific Railroad Company is in possession of the section of land, under a grant from Congress for the purpose of constructing a railroad from Dubuque, on the Mississippi river, to a point on the Missouri river near Sioux city. This grant was made to the State of Iowa in 1856, and is for every alternate section, (designated by odd numbers,) for six sections in width on each side of the road.   The road was located, the lands designated by the United States, and accepted by Iowa; and then they were transferred to the railroad company by the Legislature of that State.   The section in dispute is one of those vested in the railroad company. This is the younger and inferior title, if the first grant for im-

proving the river extends along its whole length; and the material question in this case is, whether the grant made by the act of Congress of August 8th, 1846, for the river improvement, is limited to lands lying next the river, and *below* the Raccoon Fork. And although this depends on a true construction of the act, still it becomes necessary to give a brief *historical* statement of the proceedings before the Executive department respecting this claim, extending through more than ten years; these proceedings being relied on, either to conclude the title, or to control the construction of the act of Congress.

They are as follows: By the act of Congress approved August 8th, 1846, a grant of land was made to the Territory of Iowa "for the purpose of aiding said Territory to improve the navigation of the Des Moines river from its mouth to the Raccoon fork, in said Territory, one equal moiety, in alternate sections, of the public lands (remaining unsold and not otherwise disposed of, encumbered, or appropriated) in a strip five miles in width on each side of said river, to be selected *within said Territory*, by an agent to be appointed by the Governor thereof, subject to the approval of the Secretary of the Treasury of the United States."

The 4th section of that act provides that the lands shall become the property of the State of Iowa on her admission into the Union, which was very soon expected to occur. The Governor of Iowa was notified by the Commissioner of the General Land Office of this act, soon after its passage, viz: October 17, 1846, by letter, in which it is stated that, "under the grant, the Territory is entitled to the vacant lands, in alternate sections, within five miles on each side of the Des Moines river, from the northern boundary of Missouri to the Raccoon fork."

No objection to this construction was then made by the State authorities, and the agent of the State proceeded to make the selections within the limits above stated.

No question as to the extent of this grant arose until nearly two years after. It appears, however, that a letter dated February 23d, 1848, from Commissioner Young, did not adhere

to the restrictions mentioned in the first letter, but its terms seemed to concede to it a greater extent. And in 1849 this question was brought to the attention of the Secretary of the Treasury, by the delegation of the State in Congress; they claiming that the State was entitled to land along the whole course of the river to its source. In reply, (March 2d, 1849,) the Secretary, Mr. Walker, expresses an opinion that the "grant extends on both sides of the river from its source to its mouth, but not into lands on the river in the State of Missouri." This opinion conceded that *nine hundred thousand acres* above the Raccoon fork was within the grant.

In conformity with this view of Mr. Walker, selections of lands above the fork were reported by the Commissioner of the General Land Office, for confirmation, to the Secretary of the Interior, Mr. Ewing; the supervision of the public lands having passed from the Treasury to the Interior Department. Mr. Ewing, upon the ground that the opinion of Mr. Walker had not been carried into effect, held that the same was open for revision; and not concurring therein, refused to approve the selections. But, as Congress was then in session, and might "extend the grant," ordered a suspension of action in the matter.

From this decision of Mr. Ewing an appeal was taken in 1850 to the President, by whom the matter was referred to the Attorney General, Mr. Johnson, who, in his opinion of July 19, 1850, construed the grant as extending above the Raccoon fork.

No action appears to have been taken under this opinion of Mr. Johnson; and the question remained open at the accession of the next President, Mr. Fillmore, when it was submitted to the Attorney General, Mr. Crittenden, who, on the 30th June, 1851, replied that the letter of Mr. Walker had no binding effect on his successor, being but an opinion expressed, not an act done; that the opinions of Attorney Generals are merely advisory; and that the grant, in his opinion, was limited to the lands below the fork. In this opinion it appears that Mr. Stuart (then Secretary of the Interior) concurred; but afterwards, on the 29th October, 1851, he addressed the Commis-

sioner of the General Land Office on the subject, and directed the selections above the Raccoon fork to be reported for his approval, for the reasons and upon the conditions therein stated, viz: "that the question involved partakes more of a judicial than of an executive character, which must ultimately be determined by the judicial tribunals of the country." In conformity with this decision, lists of lands above the fork were submitted by the Commissioner in October, 1851, and March, 1852, and approved by Mr. Stuart in accordance with the views expressed in his letter of the 29th October, 1851. Acting under this authority, the Commissioner, in 1853, submitted lists to Secretary McClelland also, which were approved. The subject was again brought before the Secretary of the Interior in 1856, and by him referred to Attorney General Cushing. Mr. Cushing, in his reply of 29th May, 1856, advised that a proposition set forth by him be submitted to the State for a final adjustment of the matter. This proposition was not accepted by the State; and in 1858 the subject was laid before Attorney General Black, whose opinion clearly restricted the grant to the river below the Raccoon fork; that being in accordance with the construction originally given to it at the General Land Office. On mature consideration, we are of opinion that the title of neither party has been affected by the proceedings in the Land Office, or by the opinions of the officers of the Executive department, but that the claims of the parties under the two acts of Congress must be determined by the construction to be given to those acts. This we are required to do in deciding this cause.

The caption of the act of 1846 informs us that the donation was made to aid in the improvement of the navigation "of the Des Moines river;" and the body of it grants to the Territory (and State) alternate sections, to improve the navigation "of the Des Moines river, from its mouth to the Raccoon fork," in a strip five miles in width on each side of "*said river.*" And we are further told, (section 3d,) that "the said river Des Moines shall forever remain a public highway for the use of the Government of the United States, free from any toll or other charge whatever for any property of the United States,

or persons in their service, passing through or along the same.

What *navigable river* was to be improved, and was in the contemplation of Congress in 1846, when the northern portion of Iowa was a wilderness? Surely not the small streams and brooks reaching into Minnesota Territory, as is here claimed.

Congress recognised the Des Moines river, over which a free passage was secured, to be a stream emptying into the Mississippi; and from its mouth to the Raccoon fork was the "said river," on each side of which the strip of land granted was to lie.

As proof of which, we refer to the following facts: The bill was introduced into the House of Representatives by Mr. Dodge, the Delegate from Iowa Territory, and was the subject of a report by the Committee on Public Lands, which report is a document in the case agreed, and the facts therein stated are admitted. Among these facts, it appears (by a previous report of Captain Fremont, who had officially explored the Des Moines river) that from its mouth to the Raccoon fork was two hundred and three miles; that it presented no obstacles to navigation that could not be overcome, at a slight expense, by the removal of loose stones at some points, and the construction of artificial banks at some few others, so as to destroy the abrupt bends, and that this was all that would be required to render it navigable; that the variable nature of the bed and the velocity of the current would keep the channel constantly clear.

The committee's report states that the country is occupied and cultivated as high up as the Raccoon fork; and that a clear and uninterrupted navigation could be secured at an expenditure not great when compared with the object; that the land appropriated by the bill is similar in its character and object to many grants already made by Congress for other Western Territories and States, and at the same time less in quantity; but it is believed that it will be sufficient to accomplish the desired improvement; and as evidence of this, Captain Fremont's statement is relied on. The committee was, however, of the opinion, that locks and dams might be required at some of the ripples.

Accompanying this report, and as a part of it, is a letter from the Commissioner of the General Land Office, obtained by Mr. Dodge, (dated May 5th, 1846,) in which it is officially stated, "That the amount of unsold land within five miles on each side of the Des Moines river, from its mouth to the Raccoon fork, *proposed* to be granted to the Territory of Iowa by House bill No. 106, is estimated at 261,000 acres." The bill No. 106, as reported, was passed into the law before us. When we carry with us the fact that the 261,000 acres of land were surveyed, and the plats recorded in the General Land Office, to which surveys the Commissioner's letter referred, it is plain that the river, from its mouth to the Raccoon fork, was, in the view of Congress, as manifestly as if the outlines of the tract (or strip) had been given by a plan in connection with the river. Of this we have no doubt; but if we had doubts from any obscurity of the act of Congress, a settled rule of construction would determine the controversy. All grants of this description are strictly construed *against* the grantees; nothing passes but what is conveyed in clear and explicit language; and as the rights here claimed are derived entirely from the act of Congress, the donation stands on the same footing of a grant by the public to a private company, the terms of which must be plainly expressed in the statute; and if not thus expressed, they cannot be implied. Charles River Bridge *v.* Warren Bridge, 11 Peters, 420.

We concur with the following citation and reasoning of the plaintiff's counsel, to wit: Lord Ellenborough, in his judgment in Gildart *v.* Gladstone, 1 East., 675, (an action for Liverpool dock dues,) says: "If the words would fairly admit of different meanings, it would be right to adopt that which is more favorable to the interest of the public, and against that of the company, because the company, in bargaining with the public, ought to take care to express distinctly what payments they are to receive, and because the public ought not to be charged unless it be clear that it was so intended."

"The reason of the above rule is obvious—parties seeking grants for private purposes usually draw the bills making them. If they do not make the language sufficiently explicit and

*Dubuque and Pacific Railroad Co.* v. *Litchfield.*

clear to pass everything that is intended to be passed, it is their own fault; while, on the other hand, such a construction has a tendency to prevent parties from inserting ambiguous language for the purpose of taking, by ingenious interpretation and insinuation, that which cannot be obtained by plain and express terms."

The second ground relied on in support of Litchfield's title is, that he is an innocent purchaser from the State of Iowa of land conceded to belong to the improvement fund by the officers and agents of the United States; and having been certified as part of the grant, and as being one of the odd sections belonging to Iowa, the principal is bound by the acts of his agents, and that these binding acts cannot be revoked at the pleasure of the Secretary of the Interior, as is here assumed to be done.

We have set forth the proceedings on this claim, and have already expressed the opinion, that the courts of justice are not concluded by them. The principal reason, however, why the conveyance to Litchfield, under the river improvement grant, cannot be upheld, is this: The act of Congress was a direct grant to Iowa in fee of an undivided moiety of the whole tract lying on each side of the river from the Raccoon fork to the Missouri line. Congress had the undoubted power to make the grant and vest the fee.

No authority was conferred on the Executive officers administering the public lands to do more than make *partition* between the tenants in common, Iowa and the United States, in the manner prescribed by the act of Congress.

The premises in dispute lie sixty miles beyond the limits of the tract granted; it was therefore impossible to make partition, under this grant, of lands lying outside of its boundaries; and all attempts to do so were merely nugatory. It follows that the plaintiff below has no title, and his action must fail.

The Attorney General has intervened, and insists that this action is a mere fiction, and was intended to draw from this court an opinion, affecting the rights of the United States and others, the parties to this suit having nothing at stake, and that the case should be dismissed.

. To meet this imputation of contrivance, the parties and their counsel have filed affidavits and statements, from which it satisfactorily appears that the action was brought by a bona fide claimant under the grantee of the river improvement fund against the railroad company; and although the case agreed was made up in a friendly spirit, nevertheless the object was to try the title, and this was done at the instance of some of the Executive officers.

If the judgment of the District Court were affirmed, the defendant below would lose the land; and it being reversed, the plaintiff below loses it. The action was obviously brought to carry out Secretary Stuart's suggestion, when he said, "That the question involved partakes more of a judicial than an executive character, and must ultimately be determined by the judicial tribunals of the country."

We have therefore felt bound to hear and decide the cause on its merits; and finding that the plaintiff below has no title, we direct that the judgment of the District Court be reversed, and the cause remanded; and that court is ordered to enter judgment for the defendant below.