ROSS-MEEHAN BRAKE SHOE FOUNDRY CO. v. SOUTHERN MALLEA-
BLE IRON CO. et al.

(Circuit Court, E. D. Tennessee, S. D.   March 20, 1896.)

No. 466.

1. EQUITY PRACTICE—CREDITORS' BILLS.
    Bills for the foreclosure of a mortgage and as general creditors' bills were filed against the S. Co. A receiver was appointed in the first suit, and the receivership extended to the others, and all the suits were then consolidated. An auxiliary suit having been brought by the receiver to enforce a subscription to the stock of the S. Co., the defendant set up in his answer objections to the jurisdiction of the court in the original suit, on the ground that, as the consolidated bills did not show exhaustion of the legal remedy by returns of nulla bona, the cause was not one of equitable cognizance. *Held* that, even if the defendant in the auxiliary suit could raise objections to the jurisdiction of the court in the original suit, the objection was without merit, since the bills were for foreclosure as well as general creditors' bills, and simple contract creditors have the right to intervene in such suits, while it is the practice in the circuit court for the Eastern district of Tennessee to make all foreclosure suits against insolvent corporations general creditors' bills as well, in order to secure complete winding up.

2. CONSTITUTIONAL LAW—TRIAL BY JURY—SUITS IN EQUITY.
    The enforcement of the liability of a subscriber to the stock of a corporation by an auxiliary suit in equity, brought by the receiver of the corporation appointed in a creditors' suit instituted upon its insolvency, does not infringe the constitutional right of such subscriber to a trial by jury.

3. CORPORATIONS—SUBSCRIPTIONS TO STOCK—CALLS.
    When a corporation is insolvent, and proceedings are pending, instituted by creditors, to wind up and distribute its assets, no call or assessment is necessary before the institution of suits to collect unpaid balances on subscriptions to its stock.

4. SAME - MISREPRESENTATIONS.
    When proceedings are instituted to collect a subscription to the stock of a corporation after its insolvency and the institution of proceedings to wind

it up, the subscriber cannot defend against the claim on the ground of fraudulent misrepresentation in securing his subscription, without showing that he exercised the greatest diligence to discover the fraud and repudiate his contract of subscription.

5. SAME—CONSTRUCTION OF CHARTERS—GENERAL ACTS.

The rule that a grant by legislative charter is to be strictly construed, and that nothing passes by implication, applies with even greater force to articles of association organizing a corporation under general laws than to a charter granted by special act.

6. SAME—INCREASE OF STOCK—TENNESSEE STATUTE.

The general incorporation act of Tennessee, as adopted in 1875, provides that a corporation organized under it "may, by by-laws, make regulations concerning the subscription for or transfer of stock, fix upon the amount of capital stock, * * * the division of the same into shares, the time required for payment thereof," etc. An amendment, adopted in 1883, provides that "any corporation which may desire to change its name, increase its capital stock," etc., may do so by filing a certificate, with the same formalities as its original articles of association. *Held* that prior to the amendment of 1883 no power was given by such act to corporations organized under it to increase their capital stock, and that an attempt by such a corporation to increase its stock by a by-law was of no effect, and the subscriptions to the increased stock were void.

7. SAME—ILLEGAL ACTS—ESTOPPEL.

When corporate stock has been illegally increased, not by a mere irregular exercise of an existing power, but by an act which the corporation was wholly without power to do, a subscriber to such increased stock is not estopped to defend an action on his subscription on the ground of the illegality, by having acted as president and manager of the corporation, and representing the stock at meetings of stockholders, whether the action be brought by the corporation itself or by a receiver acting in the interest of creditors.

Wheeler & McDermott, for receivers.

White & Martin, for defendant Elliott.

CLARK, District Judge. The above is a consolidated cause pending in this court. Three separate bills have been filed against the defendant company as an insolvent corporation. Receivers were appointed under the first bill, and the receivership extended to the subsequent bills as filed. The bills, as now consolidated, are for the foreclosure of a mortgage on defendant's property, and as general creditors' bills, to wind up the defendant company as an insolvent corporation. The usual steps taken in such cases have been had in this. In the progress of the case, and on December 5, 1894, the receivers appointed prepared and presented to the court, Judge Key presiding, a bill against the defendant Elliott, a citizen of the state of Alabama. It is alleged in the bill (as appears to be the case) that a large balance of indebtedness exists against the corporation, after all of its other assets shall have been exhausted, and that it is necessary to collect unpaid subscriptions, and that defendant Elliott is indebted to the company for a large balance on his subscription to capital stock. This bill was presented to Judge Key, who made the following order thereon:

"File the foregoing bill or petition as a dependent and auxiliary bill in this cause, upon a proper cost bond, with security, being executed by the petitioners, and issue process as prayed for.

"Sept. 7th, 1894.                                    D. M. Key, Judge."

Thereupon the bill was filed, and defendant Elliott answered the same, and in his answer sets up various defenses, and among them objections to the jurisdiction of the court in the original case in which this is filed as a dependent bill. The insolvent corporation was organized under the general incorporation act of 1875, and its original or initiatory stock was fixed by by-law at $50,000, and was subsequently and at different times attempted to be increased by resolution of the stockholders to $70,000, again to $80,000, and finally to $100,000, and defendant Elliott is a subscriber to the last increase of stock from $80,000 to $100,000. The defendant Elliott was president and general manager of the company for the period of about 11 months, beginning in 1892 and extending into 1893. He also attended meetings of stockholders representing his stock, as well as meetings of directors. No certificate of stock appears to have in fact been issued to defendant Elliott, but his subscription is in proper form. The issues now to be disposed of arise under this bill by the receivers against Elliott, and a more particular statement of the facts and history of the case is not deemed necessary to an understanding of this branch of the litigation.

Defendant's first contention is that the court is without jurisdiction, and the point made is that the present suit is in no sense a dependent and auxiliary bill, but an independent suit. The court has, however, by express order, made it such, and this bill is filed in the original case, and such order has not been set aside or reversed, and the objection is, therefore, according to Davis v. Gray, 16 Wall. 204, not well taken. Moreover, the proposition that this bill is in its essential character auxiliary or ancillary to the original suit, and that the court has full jurisdiction of it as such, is fully sustained by the case of White v. Ewing, 159 U. S. 36, 15 Sup. Ct. 1018; and the entire procedure in the case before Judge Key is fully sanctioned by the cases of Davis v. Gray and White v. Ewing. The defendant contends that, treated as an auxiliary bill, the court was without jurisdiction of the original bill, and that plaintiffs have no right, for this reason, to recover. Passing by the question whether the defendant can, in this dependent suit, make an objection to jurisdiction in the original case, it is clear, I think, that this contention cannot be sustained. The objection made is that the consolidated bills do not show exhaustion of the legal remedy by nulla bona return, and that the case is not, therefore, one of equitable cognizance. As the bills are bills for foreclosure as well as general creditors' bills, it is not perceived on what basis an attack upon the jurisdiction can rest. The court certainly had jurisdiction to foreclose the mortgages, and it was pointed out in Hollins v. Iron Co., 150 U. S. 379, 14 Sup. Ct. 127, that in such foreclosure suit simple contract creditors can intervene, and assert any equity or priority in respect to the property, and secure protection in that proceeding, and it has become the well-established practice of this court in foreclosure suits against an insolvent corporation to make the suit also a general creditors' bill, for the purpose of having all liens and priorities settled, and a complete winding up and distribution of assets made. And it was decided in Hollins v. Iron Co., that the objection that plaintiff had not

exhausted the legal remedy before commencing proceedings in equity must be made in limine, and, if not so made, that a court of equity is not ousted of jurisdiction; and certainly this defense, coming, as it does, in an ancillary suit, and in an answer at the hearing after the original case is well-nigh ended, is too late. And, the corporation being confessedly insolvent, it is doubtful if there is any basis in the facts of the case for this defense, aside from the legal objection to the time and manner in which it is attempted to be presented.

It is next objected that suit cannot be maintained in a court of equity in the United States court, because the demand is purely legal, and deprives the defendant of trial by jury. This contention is again met and answered adversely to defendant by White v. Ewing, supra, and Porter v. Sabin, 149 U. S. 473, 13 Sup. Ct. 1008, in which Mr. Justice Gray, giving the opinion of the court, said:

"It is for that court, in its discretion, to decide whether it will determine for itself all claims of or against the receiver, or will allow them to be litigated elsewhere. It may direct claims in favor of the corporation to be sued on by the receiver in other tribunals, or may leave him to adjust or settle them without suit, as in its judgment may be most beneficial to those interested in the estate. Any claim against the receiver or the corporation the court may permit to be put in suit in another tribunal against the receiver, or may reserve to itself the determination of; and no suit, unless expressly authorized by statute, can be brought against the receiver without the permission of the court which appointed him."

The principle is that jurisdiction of the creditors' suit and the receivership draws to such jurisdiction all litigation necessary to completely wind up the insolvent corporation, and distribute its assets legally; and it has never been supposed that the constitutional provision for trial by jury in any manner restricted or affected jurisdiction of a chancery court as it existed at the time of the adoption of the constitution. This contention is therefore wholly untenable. It is again insisted that plaintiffs cannot recover because the suit was not preceded by a call or assessment against the defendant as a subscriber, and that until this is done no right of action accrues. In a suit by a solvent, going corporation to collect subscription, and in certain suits provided by statute, this would be true; but it is now quite well settled that when the corporation becomes insolvent, with proceedings instituted by creditors to wind up and distribute its assets, no call or assessment is necessary before the institution of suits to collect unpaid balances on subscription. Hatch v. Dana, 101 U. S. 205; Holmes v. Sherwood, 3 McCrary, 405, 16 Fed. 725; Washington Sav. Bank v. Butchers' & Drovers' Bank (Mo. Sup.) 17 S. W. 644; Bank v. Gillespie, 115 Pa. St. 564, 9 Atl. 73; Tayl. Priv. Corp. § 703.

The defendant also sets up as a defense that his subscription to this stock was obtained under fraudulent misrepresentations as to the condition and past business operations of the company, and that the subscription is, for this reason, invalid. I am clearly of the opinion that this defense comes too late. All of the facts now known to the defendant as grounds for rescinding his contract were such as he could, at any time, have discovered by reasonable inquiry, and where the means of knowledge are open to him the ef-

fect is the same as knowledge itself; and, if the defendant could in any case make this defense after insolvency, and after institution of proceedings to wind up the corporation, it would be necessary for him to show that he exercised the greatest diligence to discover the fraud, and to promptly repudiate his contract of subscription. Chubb v. Upton, 95 U. S. 665; Upton v. Englehart, 3 Dill. 496, Fed. Cas. No. 16,800; Cunningham v. Railroad Co., 2 Head, 23.

The only remaining defense is that the attempted increase of stock to which the defendant became subscriber was one which the corporation was without authority to make, and that it was, therefore, illegal, and the defendant's subscription thereto void, and this presents a serious issue. Was the increase of stock, as here attempted by the resolution of the stockholders, if we treat this as equivalent to a by-law, illegal? And, if so, has the defendant, by his connection with the company as above stated, estopped himself to make this question? Whether or not the corporation has power to increase its stock by by-law, after the capital stock has been originally fixed, was a question expressly reserved by the supreme court of the state in Cartwright v. Dickinson, 88 Tenn. 476, 12 S. W. 1030. It was decided in that case that subscription to capital stock above the amount fixed by by-laws, when that had been previously all taken, is absolutely void. The general incorporation act, under which defendant company was organized, contains the following provision upon this subject: "The corporation may, by by-laws, make regulations concerning the subscription for or transfer of stock, fix upon the amount of capital stock to be invested in the enterprise, the division of the same into shares, the time required for payment thereof by the subscribers for stock, the amount to be called at any one time; and, in case of failure of any stockholder to pay the amount thus subscribed by him at the time and in the amounts thus called, a right of action shall exist in the corporation to sue said defaulting stockholder for the same." Plaintiffs' learned counsel directs attention to the fact that "by-laws" is employed in the plural, instead of the singular, number in the statute, as indicating that more than one such by-law might be made in regard to the capital stock of the corporation, and defendant's able counsel attaches importance to the terms "fix upon the amount of capital," as indicating permanency in the original amount determined upon. As various other subjects are enumerated to be regulated by by-laws, as well as the amount of capital stock, I do not think much force is derived from this circumstance, nor do I think that the primary definition of the term "fix" is of serious consequence in this connection. Mere verbal distinctions such as these can have little influence in the determination of a question so important as the one now considered. The remainder of the context in which the words occur, as well as the entire statute upon the subject, must be taken into account, and the reasoning must be somewhat broad and practical. Prior to the incorporation act of 1875, the method of forming corporations had been by special legislative charters, in which the amount of the capital stock was definitely fixed, and publicly and easily known. A certain mode of ascertaining the real capital of the company was

thus secured to the public, and such legislation with reference to these companies gave the public definite information as to their property in much the same way that registration laws furnish information as to the condition of private property generally. When a change in the mode of establishing corporations was made,—as by act of 1875,—the previous law and its construction by the courts is to be considered in the interpretation of the new law and in determining the extent of the change. Settled legislative policy is not to be regarded as abandoned further than the terms and objects of the new legislation require.

"A controlling purpose," said the supreme court of Alabama, "as we suppose, in authorizing or in compelling the creation of private corporations under general laws, is to secure uniformity and equality of corporate powers, functions, and privileges, that all corporations of the same class, formed for like purposes, should possess the same capacities and properties, and exercise and enjoy the same franchises and privileges. Unless it was intended to work a radical change in the nature and character of these artificial beings, the mere creations of the law, and to subvert the whole theory which had prevailed in reference to them, it cannot have been contemplated that they should for themselves create power and privileges by declaration or reservation, whether the declaration or reservation is expressed in the articles of incorporation or in the constitution or by-laws ordained by the corporators for their government. Such declarations or reservations would soon become more liberal and diverse than was the liberality and diversity of the grants of corporate power by special legislative enactment, the evil it was intended to remove." Insurance Co. v. Kamper, 73 Ala. 325.

In a direct grant by legislative charter the rule that the grant is strictly construed, and that nothing passes by implication, has become axiomatic in the law of corporations. And this general rule of construction applies with still greater force to articles of association organizing a corporation under general laws, such as the act of 1875. In Oregon Ry. & Nav. Co. v. Oregonian Ry. Co., 130 U. S. 26, 9 Sup. Ct. 409, the supreme court of the United States said:

"It is to be remembered that where a statute making a grant of property or of powers or of franchises to a private individual or a private corporation becomes the subject of construction as regards the extent of the grant, the universal rule is that in doubtful points the construction shall be against the grantee and in favor of the government or of the general public. As was said in the case of Charles River Bridge v. Warren Bridge, 11 Pet. 420: 'In this court the principle is recognized that in grants by the public nothing passes by implication.' See, also, Railroad Co. v. Litchfield, 23 How. 66; Turnpike Co. v. Illinois, 96 U. S. 63. Therefore, if the articles of association of these two corporations, instead of being the mere adoption by the corporators themselves of the declaration of their own purposes and powers, had been an act of the legislature of Oregon conferring such powers on the corporations, they would be subject to the rule above stated, and to rigid construction in regard to the powers granted. How much more, then, should this rule be applied, and with how much more reason should a court, called upon to determine the powers granted by these articles of association, construe them rigidly, with the stronger leaning in doubtful cases in favor of the public and against the private corporation. We have to consider, when such articles become the subject of construction, that they are in a sense ex parte. Their formation and execution—what shall be put into them as well as what shall be left out—do not take place under the supervision of any official authority whatever. They are the production of private citizens, gotten up in the interest of the parties who propose to become incorporators, and stimulated by their zeal for the personal advantage of the parties concerned, rather than the general good."

In harmony with this rule of strict construction, the cases are unanimous in holding that a corporation has no power to increase or diminish its capital stock, unless expressly authorized to do so. No such power can be claimed by implication. Railroad Co. v. Allerton, 18 Wall. 235; Scovill v. Thayer, 105 U. S. 143; Insurance Co. v. Kamper, 73 Ala. 325; Spring Co. v. Knowlton, 103 U. S. 49; Kampmann v. Tarver (Tex. Sup.) 29 S. W. 768; Tayl. Priv. Corp. 133.

In view of previous legislation and public policy involved in fixing permanently and definitely the amount of capital stock, so as to furnish a certain and easy mode of inquiry as to the condition of corporations, I think the conclusion is unavoidable that a corporation organized under the general law is authorized by by-law to fix only the original or initiatory capital stock of the company. It is clear that the statute does not, in terms, confer any power to either increase or diminish such stock, when once fixed, by subsequent by-law, and it has been seen that no such power can exist by implication. Indeed, the fact that with the previously well-known rule of strict construction no such power is added by apt words, furnishes an argument of much force against the existence of the power. It is impossible to think that the legislature, in view of the established law, could have intended to grant such power without doing so in suitable language. If the corporation may, by implication, increase its stock, it may with equal reason decrease the same, and so enlarge or diminish the amount of capital stock without restriction; and in the general incorporation law no notice or intimation whatever is given of the existence of such power. It is quite obvious that such a construction of the statute as this would furnish opportunity for the loosest possible methods in the business of these important and large concerns, and would open wide the door to fraudulent imposition on the public. In the case already referred to,—Insurance Co. v. Kamper,—the supreme court of Alabama, denying that such power could arise or exist by implication, said:

"Changes of the capital stock of corporations of this character involve changes in organization, and a displacement of the power and influence the original stockholders, or their legitimate successors, are of right entitled to exercise in the election of officers, and in the general management of the corporate affairs and business. That corporations have not an implied power to effect such change—that it can be effected only by legislative sanction—seems to be settled. Green's Brice, Ultra Vires, 112; Thomp. Liab. Stockh. par. 115; Lathrop v. Kneeland, 46 Barb. 432; Insurance Co. v. McKelway, 12 N. J. Eq. 133; Railroad Co. v. Schuyler, 34 N. Y. 30; Railway Co. v. Allerton, 18 Wall. 233; Scovill v. Thayer, 105 U. S. 143."

This is almost the exact language of the court in Railway Co. v. Allerton. This power of a corporation over its stock is fundamental and important. If the capital stock may be enlarged or diminished at will by the simple method of by-law, a temptation to constant change would be offered. The power would be resorted to as often as business reverses or the results of speculation might suggest. An unsuccessful concern could be thus bolstered up from time to time, and its operation extended over a period far beyond its usefulness, thereby causing greater loss to innocent creditors on the one hand and unwary subscribers to stock on the other. The only method pro-

vided by the general incorporation law, as now amended by the act of 1883 (chapter 163, § 19), by which the right to increase the capital stock, or any other corporate power, can be obtained, is by an amendment of the charter. That act, so far as it relates to the matter now under consideration, is as follows:

"Any corporation which may desire to change its name, increase its capital stock, or obtain any powers granted herein, shall have the right to do so, by the board of directors of said corporation copying said amendment, and making an application in these words:

"   " 'State of Tennessee—Act of Incorporation.

" 'We, the undersigned, comprising the board of directors of (here insert the name of the corporation), apply to the state of Tennessee, by virtue of the general laws of the land, for an amendment to said charter of incorporation, for the purpose of investing said corporation with the power (here state the clause in the general law aforesaid, which is desired as an amendment, or if it be simply to change the name, so state the fact)..

" 'Witness our hands the ―― day of ――.
"   " '(To be signed by the directors.)'

"This instrument shall be probated or acknowledged as hereinafter provided, and the certificate of registration, given by the secretary of state, under the great seal of the state, shall complete the amendment to said act of incorporation, and the validity thereof shall not, in any legal proceedings be collaterally questioned."

This statute is itself a legislative interpretation that the power to increase the capital stock did not exist under the previous law of 1875, for otherwise this statute would have been useless. And I think it is significant, too, that when the attention of the general assembly was thus deliberately directed to this point, it was unwilling to clothe such corporations with the power to increase or decrease their capital stock, except in a manner which was equally public, and attended with the same formalities, as was the original charter. It is obvious, I think, that the general assembly fully recognized the evil of leaving it within the power of the corporation, after having fixed upon the amount of its capital stock, to constantly increase and diminish the same, thereby rendering it impossible for the public to know anything of the amount of such capital stock. This act maintains the policy of previous laws upon this subject, and gives reasonable permanence and publicity to the amount of capital stock of the company. I am therefore clearly of opinion that the attempted increase of stock in this case, to which the defendant Elliott became subscriber, was illegal, and his subscription void, conferring on him no right, and subjecting him to no liability.

It remains only to determine whether or not defendant has by his conduct precluded himself from making this defense. In considering this question, I have been fully mindful of the distinction as it affects the case between a suit at the instance of the creditors and one by the company itself. It is clear, I think, that in a suit by the company to collect defendant Elliott's subscription, it would be open to him to make this defense. This suit is, however, in the interest of creditors of the corporation, and does this change the result? I think the case of Scovill v. Thayer, 105 U. S. 143, answers this question in the negative. That was a suit by creditors to recover an unpaid balance on subscription, and the defendant in

that case had attended the meeting at which it was voted to issue the illegal stock, had received and held a certificate for such stock, and the officers of the company had publicly represented its capital to be equal to the amount of both the authorized and unauthorized capital stock. Plaintiff's counsel relies on a number of cases which hold that where the power to issue the stock exists an irregular exercise of this power is such defect as may be waived, and that defendant may be estopped from making such defense. These cases, however, have no application to an increase and subscription where there was an entire want of power. The distinction is that, between the existence of a power irregularly exercised and the absolute want of power to do the act in any manner whatever, in which latter case the act is absolutely void, is incapable of ratification, and is not cured by estoppel. In this case not even an abstract power to increase its stock resided in this corporation without amendment of the charter, and a right to obtain such power by amendment of its charter was not the power itself, any more than the right to obtain an original charter would be the powers under the charter when obtained. The right to obtain the power and the power when obtained are clearly distinguishable. An amendment of the charter must be registered just as the original, and until this is done is subject to the same objection which renders void a defectively registered charter. Anderson v. Railroad Co., 91 Tenn. 44, 17 S. W. 803. It is true that Scovill v. Thayer was distinguished, and its limits stated, in Banigan v. Bard, 134 U. S. 294, 10 Sup. Ct. 565, and Handley v. Stutz, 139 U. S. 424, 11 Sup. Ct. 530, but the doctrine of the case has not been questioned, and it has become a leading authority. It is also true that in that case there was an express statutory restriction on the amount of the capital stock, and that the increase was above this limit; but where the power is wanting it can make no difference in the effect whether this lack of power results from an express limitation or a limitation by implication, for, as the court in Marbury v. Land Co., 10 C. C. A. 401, 62 Fed. 342, said:

"It is well-settled law in this country and in England that a corporation is impliedly prohibited from doing anything which it is not expressly permitted by its charter to do, or which is not fairly incidental and necessary to the enjoyment of that which is expressly permitted."

The case of Scovill v. Thayer was cited with approval in Cartwright v. Dickinson, and was followed in Insurance Co. v. Kamper, 73 Ala. 325, where this subject is much considered in an able opinion by Chief Justice Brickell. And in the recent case of Kampmann v. Tarver the cases of Insurance Co. v. Kamper and Scovill v. Thayer are expressly approved, and their doctrine applied, by the supreme court of Texas; Gaines, C. J., saying:

"The opinions in these two cases are well considered, elaborate, and are well supported by the numerous authorities therein cited. We think they render any further discussion of the question on our part unnecessary." 29 S. W. 768.

And see Thomas v. Railroad Co., 101 U. S. 71; Mallory v. Oil Works, 86 Tenn. 598, 8 S. W. 396; Elevator Co. v. Memphis & C. R. Co., 85 Tenn. 703, 5 S. W. 52.

It is sufficient, therefore, without pursuing the discussion further, to say that I am of opinion defendant Elliott may make the defense that his subscription to this increase of stock is void, and that this defense is a complete answer to the suit. The court has treated the method of increasing the stock in this case as equivalent in effect to a by-law, and rested the ruling on the entire want of power; for, if the power existed, the exercise by resolution instead of formally adopted by-law would be an irregular exercise of power which it is believed would, on the facts of this case, be cured by estoppel. The result is that the bill is dismissed, and plaintiffs will pay the costs of the suit out of the funds in their hands to the credit of the receivership.