[Grangers' Life and Health Ins. Co. v. Kamper.]

# Grangers' Life and Health Insurance Company *v.* Kamper.

*Bill in Equity by Subscribers to Stock in Corporation to have vacated and annulled their Subscriptions, and to have delivered up and canceled Promissory Notes given therefor.*

1. *Capital stock of corporations; statutory mode for increasing must be pursued.*—When a corporation relies upon a grant of power from the legislature to do an act, it is as much restricted to the mode prescribed by the statute for its exercise, as it is to the particular thing allowed to be done ; and hence, if the legislature prescribes a mode for the increase of its capital stock, and that mode is not pursued, the statute would furnish no authority for the increase, and would not impart to the subscriptions for such increased stock and notes given therefor a validity or obligation not otherwise attaching to them.

73 325|
94 476|

73 325|
95 341|

73 325|
98 519|

73 325|
103 225|
103 554|

73 325|
112 685|

73 325|
f121 282|

[Grangers' Life and Health Ins. Co. v. Kamper.]

2. *Corporation under general law; office of declaration.*—When a corporation is sought to be organized under the general law, the declaration which the law requires to be signed and recorded is an acceptance by the corporators, under the name designated, and for the objects expressed, of the corporate powers and capacity the law confers, and a statement of the principal constituents of the corporation—its name, the objects for which it is formed, the amount of its capital stock, the names of the stockholders, and the quantity of interest each has in the capital stock; and if more be introduced therein, it is mere surplusage, not adding to, or detracting from the force of the declaration.

3. *Same; what constitutes the charter.*—Of every corporation formed under the general law, the law itself, and not the declaration of incorporation, or the constitution and by-laws adopted for corporate government, becomes the charter and enumerates the powers which are to be exercised, and the nature and extent of the corporate franchises and privileges; and hence, the expression in the declaration of incorporation of a life insurance company, filed under the general law, that it was the intention and privilege of the company to increase its capital stock and number of shares whenever deemed proper and expedient, did not authorize an increase of the capital stock at the mere will of the company, and in such mode as it might elect.

4. *Corporations have no implied power to change capital stock.*—Corporations have not, either at common law or under the statute, an implied power to effect a change in its capital stock, but such change can only be effected by legislative sanction.

5. *Life insurance company organized under general law in 1874; increase of stock by, void.*—An attempt by a life insurance company, organized in 1874 under the general law, to increase its capital stock beyond the limit fixed by its charter was *ultra vires*, and the increased stock issued by the company was therefore void, conferring on the holders no rights, and subjecting them to no liabilities.

6. *Subscription to stock of corporation a contract; when without consideration.*—A subscription for the stock of a corporation is a contract, and, like other contracts, must be supported by a consideration. The consideration upon which it rests is the right secured by it of membership in the corporation, and the interests accruing from membership; and when these are not secured, and can not legally result from the subscription, it is wanting in consideration, as are notes or other obligations given for its payment.

7. *Corporation; what essential to creation.*—No particular words or expressions are essential to the creation of a corporation; but if the legislative intention is manifested clearly to clothe an association of persons with rights, privileges and powers, to be enjoyed and exercised by a collective name, and for designated purposes, and in a corporate capacity, the association, by implication, is a corporation.

8. *Same; extraterritorial existence and powers.*—A corporation can have no legal existence beyond the territorial boundaries of the sovereignty by which it is created, and it can transact business within the scope of its powers in other sovereignties only upon such terms and conditions as such sovereignties may provide; and whether only terms and conditions are prescribed, upon which a foreign corporation is permitted to exercise its powers, whether there is concurrent action of two or more States in the the creation of a single corporation, or whether a domestic corporation is created, is a question of legislative intent.

9. *When special act creates a corporation, and not merely confers on a foreign corporation a license to transact business.*—The Grangers' Life and Health Insurance Company having been incorporated in this State, the legislature of the State of Mississippi afterwards passed an act, entitled "An act to authorize the Grangers' Life and Health Insurance Company to create and establish branch departments in this State," and providing

[Grangers' Life and Health Ins. Co. v. Kamper.]

that said company, "incorporated by, and under the laws of the State of Alabama, be and the same is hereby authorized and empowered to create and establish in this State one or more branch departments thereof, whenever there shall be subscribed to, and paid into said company, or secured to the satisfaction of the president and general board of directors thereof, one hundred thousand dollars as capital stock for such branch department, so created and established, the said stock to be subscribed for, and owned by, and the directors of any such branch department to be, citizens of the State of Mississippi;" and further providing that whenever any such department or departments shall be created and established, the said company "shall be regarded as a home company, and shall be entitled to, and may exercise and enjoy all the rights, privileges, immunities and exemptions of life insurance companies incorporated by the laws of the State of Mississippi;" and making it the duty of the Auditor of said State, on the creation and establishment of any such branch department, to give to the officers or agents of said company a certificate "stating the same, and authorizing it to do business as a domestic life insurance company of Mississippi." *Held,*

(*a*)  That the effect of this act was not merely to license, or to enable the corporation formed in this State to transact business and exercise its powers in Mississippi, but to create a corporation having the same name, and like franchises as the corporation formed in this State.

(*b*)  That while there may have been a purpose, that of the domestic corporation thus formed the corporation of this State should be a constituent, and that some undefined relations should exist between the two corporations, this purpose did not change the scope, operation and effect of the act; but that the two corporations were distinct legal entities, and the act of incorporation of each was confined to the territorial limits of the sovereignty from which it proceeded.

10.  *Bill by subscribers to stock in corporation to have vacated and annulled their subscriptions, and to have canceled notes given therefor; when without equity.*—An organization having been made under said act of the legislature of Mississippi, and subscriptions taken by citizens of that State to the capital stock of said company, and the Alabama corporation having made an assignment of all its books, papers, notes, assets and effects (whether a general assignment for the benefit of creditors, or otherwise, not shown), to an assignee, who holds and claims the exclusive right to collect notes made by the Mississippi subscribers for their subscriptions, except a part which was paid in cash, *it was further held,* on a bill filed by the Mississippi subscribers against said company, its officers and said assignee, seeking to have vacated and annulled their subscriptions on the books of said company, to have delivered up and canceled their notes given therefor, and to have refunded to them moneys paid thereon, on the ground that they were induced to subscribe to said stock by false and fraudulent representations made to them by the officers of said company touching the amount of its capital stock, its powers under its charter, and its financial condition, and that said subscriptions were in excess of the amount of capital stock authorized by said company's charter,

(*a*)  That if the subscriptions by the complainants were of the Mississippi corporation, as the bill tends to show, their notes did not pass by the assignment, unless they had been negotiated to the Alabama corporation, which is not shown to be the case.

(*b*)  That if the assignment is a general assignment for the benefit of creditors, and valid as such, the assignee succeeded only to the rights of the assignor, and is bound and affected by all the equities, and subject to all the defenses which would have affected the assignor, or to which it would have been subject; and that in no just sense is he a purchaser for value, or the representative of creditors.

(*c*)  That, in either aspect, the case presented by the bill is strictly of

legal cognizance, the demands being legal, the subjects of suit at law, and the defenses discloses being also legal; and that, the complainants having a plain and adequate remedy at law, the bill was without equity.

11. *Jurisdiction of court of equity to decree cancellation of promissory notes; when sustained.*—A court of equity has jurisdiction to decree the rescission of written instruments, the delivering up and cancellation of deeds, covenants, bonds, bills, or notes; but a resort to the jurisdiction, to be sustained, must be expedient "either because the instrument is liable to abuse from its negotiable nature, or because the defense, not arising on its face, may be difficult or uncertain at law, or from some other special circumstances peculiar to the case."

APPEAL from Mobile Chancery Court.

Heard before Hon. JOHN A. FOSTER.

This was a bill in equity by John F. Kamper, A. L. Jamison, and numerous others, "for themselves and such other persons as shall make themselves parties to this suit, and bear their proportion of the expense thereof," against the "Grangers' Life and Health Insurance Company of the United States of America, a corporation created by the laws of the State of Alabama," and the officers of said corporation, named in the bill, and against Gaylord B. Clark, "claiming to be assignee of said company," and Edgar L. Elliott, W. A. Bodenhamer and W. E. Baskin, "trustees of said company;" was filed on 16th January, 1880; and the case made thereby is substantially as follows: On 12th November, 1874, said insurance company was incorporated under the general laws of this State, the corporators filing in the office of the judge of probate of Mobile county the declaration required by the statute, which is made an exhibit to the bill. The object for which the corporation was formed, as stated in this declaration, was "to make and issue, buy and sell, grant and otherwise dispose of policies of insurance, endowments, annuities, and contracts of every description depending upon the duration of human life; also to make and issue, and otherwise dispose of policies of insurance against the occurrence of accidents of all descriptions affecting human beings; also to make and issue, and otherwise dispose of policies of indemnity in specified sums upon the health of individuals, and, in general, to do and perform any and every act and thing which may now be lawfully done and performed by life and health insurance companies, incorporated under the existing laws of the State of Alabama, and of the United States of America; *also it shall have power to create new and other departments at such places, and in such manner as it may deem fit under its constitution, subordinate to, and under the control of the home office at Mobile, for the purpose of extending the business of the corporation.*" In this declaration it is further stated: "The amount of capital stock is one hundred thousand dollars, and the number of shares is one

thousand, divided into sums of one hundred dollars each, *with the intention and privilege of increase of both capital stock and number of shares, at such time or times, and in such manner as said corporation may deem expedient and proper.*" The capital stock of the corporation is averred in the bill to have been limited to one thousand shares of one hundred dollars each, all of which was subscribed for and taken on the day of its incorporation. The company organized, elected officers, and proceeded to do a business of life insurance in this State, with its home office in the city of Mobile. On 20th February, 1875, "the said officers of said corporation procured to be enacted by the legislature of the State of Mississippi an act entitled 'An act to authorize the Grangers' Life and Health Insurance Company to create and establish branch departments in this State.'" That act, omitting the caption, is as follows:

"SECTION 1. *Be it enacted by the Legislature of the State of Mississippi,* That the Grangers' Life and Health Insurance Company of the United States of America, incorporated by, and under the laws of the State of Alabama, be and the same is hereby authorized and empowered to create and establish in this State, one or more branch departments thereof, whenever there shall be subscribed to, and paid into said company, or secured to the satisfaction of the president and general board of directors thereof, one hundred thousand dollars as capital stock for such branch department, so created and established, the said stock to be subscribed for, and owned by, and the directors of any such branch department to be, citizens of the State of Mississippi.

"SEC. 2. *Be it further enacted,* That whenever any such branch department, or departments shall be created and established, the said Grangers' Life and Health Insurance Company shall be regarded as a home company, and shall be entitled to, and may exercise and enjoy all the rights, privileges, immunities and exemptions of life insurance companies incorporated by the laws of the State of Mississippi; and it shall be the duty of the Auditor or other proper officer designated by law, whenever it shall be shown to him that any such branch department has been created and established, to give to the president, manager, general agent, or any other agent of said company a certificate stating the same, and authorizing it to do business as a domestic life insurance company of Mississippi.

"SEC. 3. *Be it further enacted,* That all laws, or parts of laws contravening the provisions of this act be, and the same are hereby repealed."

As further averred in the bill, the corporators of said company, on 26th October, 1874, adopted what is styled the "Constitution of the Grangers' Life and Health Insurance Company

of the United States of America," a copy of which is also made an exhibit to the bill. Preceding it is this recital: "Whereas, we, the undersigned subscribers hereto, citizens of the State of Alabama, and of the United States of America, have this day assembled in pursuance of an Article of Agreement signed by each of us and which Article of Agreement, with the signatures thereto, is hereby made a part and parcel of this document: Now, therefore, in compliance with the said agreement, we, the subscribers thereto, do form ourselves into The Grangers' Life and Health Insurance Company of the United States of America, under the existing laws of incorporation of the State of Alabama, and we agree that this document shall become the ·Constitution of this, the aforesaid company." This instrument provides, among other things, that it shall have succession for the period of nine hundred and ninety-nine years; that its principal office for the transaction of business shall be located in the city of Mobile; that the capital stock of the corporation "shall consist of a sum not less than one hundred thousand dollars of the lawful currency of the United States of America; and the said capital stock may be increased at the will of the general board of directors, and under the provisions, and in the manner hereinafter specified, to a sum not exceeding four million and five hundred thousand dollars of the lawful currency of the said United States of America;" and that "the president and secretary, with the consent and approval of the general board of directors, may create departments or branches of this company, and designate the territory to be included in the same." It contains elaborate provisions for the exercise of its corporate powers, and for the management and conduct of its business, and of the business and affairs of such branches or departments as may be created and organized.

After the act of the legislature of Mississippi, copied above, was approved, as is averred in the bill, the officers of said company represented to the complainants, who resided in the State of Mississippi, and had no knowledge or information of the provisions of the statutes of Alabama, touching the organization and powers of such corporations, or of the provisions of the declaration of incorporation of said company, that the said " constitution," a copy of which was shown them, was 'the charter of said corporation under and by virtue of the laws of the State of Alabama;" that they, the officers of said company, had the power to accept subscriptions to the capital stock of said company to the extent of one hundred thousand dollars from the citizens of the State of Mississippi, and that on securing said amount in said State, they were authorized to establish, and would establish a branch department of said corporation in that State; that said corporation was in an exceptionally good finan-

cial condition; that "although only ten per cent. of the sub-scription to the original stock had been paid in by the stock-holders, yet, after a business of only eighteen months, said corporation then had on hand a cash capital of one hundred thousand dollars; and that there was no outstanding matured indebtedness against the same." Relying on these representa-tions, the complainants, with the exception of John F. Kamper, separately subscribed, each for himself, to "the capital stock of said corporation" in amounts stated in the bill, and aggregating about sixty thousand dollars, paying a stated per cent. of the amounts subscribed by them respectively in cash, and executing their notes for the balance; and receiving from the company certificates of stock, issued by "said officers," which are made exhibits to the bill. These certificates are dated, at Mobile, in November and December, 1875, and in January, February, March, April and May, and one in June, 1876; purport on their face to entitle the parties named to a designated number of shares of one hundred dollars each in the capital stock of the "Grangers' Life and Health Insurance Company of the United States of America," with home office at Mobile; and, as copied in the record, have on their face, on the side or margin, these words: "Certificate of Stock. Department of Missis-sippi;" and are there again dated at Meridian, Mississippi, and most of them signed, some by the president and secretary, and others only by the president of that department. The com-plainant Kamper also subscribed for a designated amount of the capital stock of said company, paying a certain per cent. in cash, and executing his note for the balance, and receiving a certificate of stock, which is also made an exhibit to the bill, and similar to the certificates issued to the other complainants; but under circumstances, representations and promises made to him, not necessary to be here stated, in addition to the repre-sentations made to the others. It is then averred that the representations made to the complainants were false; that at the time of their subscriptions, the capital stock of said company was subscribed for and taken; that said "constitution" was "not the charter of said corporation under the laws of the State of Alabama, but was a nullity" that it had no power to estab-lish a branch department in Mississippi, or to accept subscrip-tions from, or to issue stock to complainants; that said corpor-ation did not then, or at any other time, have a cash capital of one hundred thousand dollars; that the one hundred thousand dollars for the Mississippi department had never been subscribed to said company and paid in or secured, as required by the laws of that State; that the issuance of said certificates to them was *ultra vires*, and the notes given by them were, therefore, with-out any good or valuable consideration; and that, at the time

[Grangers' Life and Health Ins. Co. v. Kamper.]

they subscribed for said stock, the financial condition of said corporation was not such as the said officers had represented, but that it was then "hopelessly involved with debt, and had proven a financial failure;" all of which was at that time well known to the said officers.

It is further averred that "afterwards, to-wit, on the — day of ———, A. D. 187—, said officers pretendedly organized what was known as the Mississippi department," and commenced the business of life insurance in that State, and continued in said business until 5th April, 1878, when "an information was filed by the district attorney of the First Judicial District of the State of Mississippi," in one of the courts of that State, averred to have had jurisdiction, "against said corporation, praying for the forfeiture of its franchises and privileges for the frauds aforementioned among others;" and, on proceedings duly had for that purpose in said court, a judgment was entered on 22d March, 1879, ousting the said corporation of its rights, privileges, powers and franchises, and forbidding it from using, exerting, or enjoying the same; and the said Edgar L. Elliott, W. A. Bodenhamer and W. E. Baskin were appointed "trustees of the creditors and stockholders of said corporation, with power and instructions to take charge of the effects," etc., of said corporation, who duly qualified and entered upon the execution of their trust, and claim an exclusive right to collect the subscription notes made by the complainants. A transcript of the proceedings in said cause is exhibited to the bill.

It is further averred that on 28th June, 1878, "said officers, without authority of law, made a pretended deed of assignment, by which they pretendedly conveyed all the books, papers, notes, assets and effects of said corporation to the said defendant, G. B. Clark, and delivered possession of the same to him;" that said Clark "now holds and claims the exclusive right to collect the stock notes made by your orators as aforesaid, under and by virtue of said pretended deeds and not otherwise;" that said Clark "has instituted suit on one of said notes against the above named John F. Kamper, which suit is now pending in the Circuit Court of the United States for the Southern District of Alabama, and your orators charge that he is proposing to collect the other stock notes, so fraudulently obtained, by suit or otherwise;" and that "the pretended deed of assignment aforesaid to the said Clark was and is in violation of the statutes of the State of Alabama in such cases made and provided, as they are advised." This deed is not made an exhibit, and above will be found the only averments in reference to it. The complainants also aver that "the said officers, or the said Clark, as assignee, have surrendered to themselves and to some others of the subscribers to the original stock in said corporation their stock

notes without the payment thereof; that the amount due on the stock notes executed for said original stock is ample to pay off all the outstanding debts and liabilities of said corporation;" and that "they have ever been ready to surrender the stock so pretendedly issued to them, and now tender the same with this bill to said defendants."

The prayer is, that the stock notes executed by the complainants to said corporation be brought into court, and canceled; that said subscriptions of stock be canceled and annulled upon the books of said company; that "the said corporation and the said defendants, officers thereof, from their individual estates, according to their liability at law, and said Gaylord B. Clark, from funds in his hands belonging to said corporation," may be ordered to pay to the complainants the amounts respectively obtained from them by said corporation on their said subscriptions, with interest; and for general relief.

The cause was heard on demurrer to the bill, assigning as a ground, among others, that it appeared from the bill that the complainants had a plain and adequate remedy at law; and on the hearing a decree was entered overruling the demurrer; and that decree is here assigned as error.

G. B. CLARK, with whom were OVERALL & BESTOR, for appellants. (1) The declaration of incorporation was filed November 12th, 1874, for organization under the general incorporation laws of Alabama. The law then in force, as far as is necessary for this discussion, the corporate existence being charged in the bill, is found in section 1755 of the Revised Code of 1867, as the same was amended by the acts of 1869-70, p. 308, whereby the purposes were enlarged in character and number to "*any lawful enterprise.*" Section 1759 of Rev. Code, as the same is amended by act of 1870-1, p. 18, leaves no limit on the amount which may be mentioned in the declaration as the capital stock. In section 1755, *supra*, it is required that the declaration should set out the number of shares and the amount of capital stock. This declaration became a matter of record. The act of 1872-3, p. 82, authorized two or more insurance companies to consolidate, and select a name and fix the capital stock. Thus the law stood at the time of the incorporation. (2) If it shall be held that by the declaration the right reserved to increase such stock over the amount named is without legal sanction, then we say that there was no corporation, and the said insurance company was an unincorporated stock company, with partnership liability on the part of its members, who, as between themselves and their privies, are bound by the terms of their organization, and their constitution and by-laws, as well as by the acts of their constituted

[Grangers' Life and Health Ins. Co. v. Kamper.]

officers and committees.— *Williams v. Bank,* 7 Wend. (N. Y.) 542; Ang. & Ames on Corp. § 591; Thomp. on Liability of Stockholders, §§ 1, 2; Field on Corp. § 55. If the power to increase the capital stock existed by reservation of the charter, or by the general law, the complainants, as against creditors and those dealing with the corporation, are estopped to deny the validity of the increase of the stock.—*Pullman v. Upton,* 6 Otto, 328; *Chubb v. Upton,* 5 Otto, 665; *Sanger v. Upton,* 1 Otto, 56 (63–4); *Upton v. Handsbrough,* 3 Bis. 417; *Boggs v. Olcott,* 40 Ill. 303; *Lehman v. Warner,* 61 Ala. 455; Thom. on Liability of Stockh. 189, 407–15. (3) If it be admitted that, where the amount of stock was by the charter limited, all stock issued in excess of the limit would be void in the absence of a *legal power* to increase the stock, as recently decided in the case of *Scovill v. Thayer,* 14 Central Law Journal, No. 16, p. 307, we think that it can be clearly shown that, for several years before the filing of the bill in this case, there was a legal *power* directly vested in the Grangers' Life and Health Ins. Co. to increase its capital stock to an unlimited amount. By the act of January 20th, 1876, p. 261, and Code of 1876, §§ 2031–35, the power to existing corporations is expressly given to increase their capital stock, and the *modus operandi* is provided, by which this increase is to be made. The proceedings to be taken under this statute, so far as necessary to effect the increase of the capital stock, rest wholly *in pais;* and when they are had, it is made "lawful for such corporation to increase its capital stock." By an examination of the bill of complaint, it will be found that certificates of stock were issued by said company to several of the complainants after the power to increase was given; and that, in addition to these, others of the complainants, while receiving their stock before the 20th of January, 1876, have, like the others, held and now hold said certificates, and now stand, as they have all along stood, as stockholders upon the books of said company; and that it was since the possession of the power to increase the capital. stock, that the Mississippi department was organized and did business. This reception of the shares of this increased stock, after the power to make the increase had been given, and this long acquiescence after the power existed, we submit, have, in law and in equity, both as to the company itself and its creditors, the same effect to estop the parties, as if no effort had been made to increase the stock until after the passage of the act of January, 1876. The acceptance and holding of a certificate of shares in a corporation make the holder liable to the responsibilities of a shareholder.—*Upton v. Tribilcock,* 1 Otto, 47; *Eaton v. Aspinwall,* 19 N. Y. 119; *Griswold v. Seligman,* 72 Mo. 110. The complainants held certificates of stock and

appeared on the books of the company as stockholders. They held themselves out to the world and to creditors, as such; they, by presenting a large capital, induced a confidence on the part of many persons to become policy holders, and pay their money to the corporation and secure its policies of insurance for the protection of their families. If ever there should be a case where persons who hold themselves out as shareholders or contributories, should not be permitted to deny their liability and cancel their obligations, this is such a case. (4) While it is true that the act of 1876 did require that a report of the stockholders' meeting and the increase of its stock should be filed in the office of the Secretary of State, and there become a record, this was not a condition *precedent* to the increase of stock; for the statute (Code, § 2034) says that it is "lawful for such corporation to increase its capital stock . . . *in conformity with such consent of the stockholders obtained as aforesaid.*" It will be observed that exactly the same prerequisites are necessary to the increase of the *bonded indebtedness* of corporations as above provided for increase of capital stock. And yet, in all such cases, the courts have held that, the power existing, the failure to pursue the methods directed were mere irregularities, which did not vitiate the bonds in the hands of *bona fide* purchasers without notice. The following authorities cited and discussed on this point: *Pendleton County v. Amy*, 13 Wall. 297; *Railroad Co. v. Chatham*, 42 Conn. 465; *Commissioners v. January*, 94 U. S. 202; *Buffalo R. R. Co. v. Dudley*, 14 N. Y. 336; *Dyer v. Rich*, 1 Metc. (Mass.) 190; *Scovill v. Thayer, supra; Central A. & M. Asso. v. Ala. Gold Life Ins. Co.*, 70 Ala. 120; *Tarbell v. Page*, 24 Ill. 46; *Chubb v. Upton*, 5 Otto, 665 (668); *Sanger v. Upton*, 1 Otto, 56 (64). There may be an estoppel on parties to a contract, even when the contract itself contravenes a well defined public policy. *Daniels v. Tearney*, 12 Otto, 415 (419). See also *S. & T. R. R. Co. v. Tipton*, 5 Ala. 787 (808); *Hall v. S. & T. R. R. Co.*, 6 Ala. 741; *Lehman, Durr & Co. v. Warner*, 61 Ala. 455; Her. on Es. §§ 570–80. (5) Stockholders, when pursued by creditors, can not be allowed to defend themselves by allegations of fraud and misrepresentation; *a fortiori*, can they not be allowed to withdraw their money from the fund by law provided as a trust for the payment of creditors.—*Ogilvie v. Knox Insurance Co.*, 22 Howard (U. S.), 380; *Chubb v. Upton*, 5 Otto, 665; *Duke v. Cahaba Navigation Co.*, 16 Ala. 372. Any misrepresentation as to the powers or rights of the company under the charter can not avail the subscriber; because one who deals with the corporation, which is a creature of law, is charged with a knowledge of the provisions of the charter. Field on Corp., §§ 73–7; *C. & O. C. Co. v. Dulany*, 4 Cr. (C. C.)

85; *Upton v. Tribilcock*, 1 Otto, 50; Bigelow on Frauds, p. 71, citing 36 Miss. 572, and 51 Miss. 829; *Thigpen v. Miss. C. R. R. Co.*, 32 Miss. 347. See also *Oakes v. Turquand*, L. R. 2, H. L. 325; *Stone v. Bank*, 3 C. P. Div. 282. (6) The stockholder has every opportunity to know the affairs of the company; and he must inform himself of its financial condition, if it has been fraudulently represented to him, and at once rescind his contract. He can not hold the stock, appear as a stockholder, and thus acquiescing in an assumed liability, afterwards repudiate it.—*Holt's case*, 22 Beav. 48; *Nicol's case*, 3 De. G. & J. 387; *Bernard's case*, 5 De. G. & Sm. 283; *Sheffield's case*, Johns. (Eng. Ch.) 451; *Reciprocity Bank*, 22 N. Y. 17; *McHose v. Wheeler*, 45 Pa. St. 32. (7) The act of Mississippi of 1875, p. 179, did not create the Grangers' Life and Health Insurance Company a corporation of that State. It was, at most, a license, putting the company on the same footing with domestic companies, and relieving them of restrictions applicaple to foreign insurance companies.—See Rev. Code of Miss. §§ 2416, 2442; *R. R. Co. v. Harris*, 12 Wall. 65; *Cowell v. Spring Co.*, 10 Otto, 55; Ang. & Ames on Corp. § 108; *Blackston Manf. Co. v. Blackston*, 13 Gray, 488; *Williams v. R. R. Co.*, 3 Dillon, 267; *Copeland v. R. R. Co.*, 3 Woods, 651; *B. & O. R. R. Co. v. Cary*, 28 Ohio St. 208. A corporation may do business in another State and exercise its powers and franchises therein, unless expressly forbidden by its charter.—*Christian Union v. Yount*, 11 Otto, 353. (8) It is perfectly competent for a corporation to make a general assignment for the benefit of its creditors. These assignments may be made by the directors.—See 2 Kent's Com. 227; *De-Ruyter v. Trustees*, 3 Barb. Ch. 119; s. c. 3 N. Y. 238; *Pope v. Brandon*, 2 Stew. 401; *Thorington v. Gould*, 59 Ala. 461. (9) It is further contended that the creditors being beneficially interested, the stockholders are estopped to avoid their subscriptions as against the assignee. He represents the creditors, and not the assignor.—*Bullis v. Montgomery*, 50 N. Y. 359. Other points are also discussed.

F. G. BROMBERG, P. HAMILTON, W. P. HARRIS, and BUCHANAN & HOUSTON, *contra*. (1) The Grangers' Life and Health Insurance Company was created in 1874, under the acts of 1868 (Pamph. Acts, 1868, p. 16), and of 1870 (Pamph. Acts, 1869–70, p. 308); and these acts, governing the special class of corporations to which said company belongs, and the general law for all private corporations, to be found in the Code, constitute the charter of said company, in which are to be found all the powers and capacities which the legislature saw fit to bestow; and, in order to confine the incidental and implied

[Grangers' Life and Health Ins. Co. v. Kamper.]

powers supposed to flow from the common law, and not very
definitely fixed in our jurisprudence, there is a provision to the
effect that these corporations shall not exercise any implied
power or powers, not expressly enumerated in the law, unless
it shall be necessary to carry out those expressly granted.
Code of 1876, § 2021. All that is needed to make the special
and general law together a special charter are the things
directed to be set down in the declaration required to be signed
and recorded by the associates, the name and business of the
corporation, the amount of capital stock, the number of shares,
the names of the stockholders, etc.; and when recorded, the
declaration performs the office of an authentic acceptance of
the terms of these laws, and furnishes the other particulars
just adverted to, which are ordinarily contained in a special
charter. The law plainly demands that the associates shall
definitely fix the amount of the capital, the value of the shares,
their number, and by whom owned, etc.; and these being fixed
by the declaration, the special and general law defines the
powers of the corporate body. The declaration can not define
these powers; nor can it enlarge or qualify them. Individuals
proposing to become a corporation can not add to or alter the
law, by annexing terms and conditions, or by reserving the
right to do what these laws do not expressly, or by necessary
implication, authorize. Incorporated by a particular name, the
corporation can not alter it, or reserve in the declaration the
right to alter it; and having declared its business to be life in-
surance, it can not engage in mining or manufacturing, or
reserve a right to make this change in business. As respects
the requirements to declare the amount of the capital stock,
the number, value, and ownership of shares, it is to be observed
that this important subject has been uniformly regulated by
the legislature. Where in special charters the amount of the
capital stock has been fixed, and no power given to vary it, it
is understood by the legal profession, that, to enable the cor-
poration to vary it, the sanction of the legislature must be
obtained. It involves the reorganization of the government of
the corporation—a change of influence of the original stock-
holders and their legitimate successors—a displacement of
power. Power over the capital stock involves such funda-
mental modifications, that it would seem to be very clear that
so important and dangerous a power can not result from impli-
cation; and it is very certain that in Alabama it must be
necessary to the exercise of some of the granted powers. But
there is no such granted power, to the exercise of which such
an implied power is necessary. That a corporation has not an
implied power to increase its capital stock, see Green's Brice's
*Ultra Vires*, p. 112; Thompson's Liab. of Stockholders, § 115;

*Lathrop v. Kneeland*, 46 Barb. (N. Y.) 434; 1 Beasley (N. J. Eq.), 133; L. R. 1 Ch. App. 247; L. R. 2 *Ib*. 714, 247. There is no pretense in this case, that an increase of stock was ever authorized by proceedings under the act of January 20, 1876, or that any attempt was made to obtain such power. It is, therefore, plain that an association making its declaration in Alabama for incorporation there, and declaring its capital stock to be one hundred thousand dollars, of one thousand shares, could not reserve the power to make a corporation of four and a half millions, with forty-five thousand shares, with franchises in all the States and Territories, and in foreign countries, having a central government in Alabama, controlling the branches on a federated plan, in which the power would be wielded outside of the State by a multitude of new foreign corporators, introduced by foreign law, which might as well change the business. (2) The attempt to reserve the power here claimed, by declaring an intention to do what could not be done, did not vitiate the declaration, or constitute an irregularity in the formation of the corporation. The *expression* of an intention to change the charter is simply nugatory, and could not affect the corporation created. The right reserved, or the intention expressed could only be effectual by legislative action; and the public, it is to be presumed, would so understand it. (3) The contract of subscription was void, though the court should adjudge that it was entered into *bona fide*, and was free from fraud, because, at the date of appellees' alleged subscriptions, all of the stock which said corporation was, by the laws of the State of Alabama, authorized to issue, had been subscribed for and taken, and it had not gotten back any portion thereof by forfeiture or otherwise. Therefore, appellees did not become shareholders, acquired no right to any of its stock, nor did they become liable for its debts, or estopped by such subscriptions from denying the relation of stockholders, even when proceeded against by creditors of the corporation, who became such on the faith of the alleged subscriptions, or otherwise.—Thomp. on Liab. of Stock. § 115; Code of Ala. (1867), §§ 1767–9; Pamph. Acts, 1869–70, p. 308; Pamph. Acts, 1875–6, p. 261, § 4; Code of 1876, §§ 1937 *et seq.*; *Ib.* §§ 2031–35; Con. of 1875, Art. 14, §§ 5, 6; 46 Barb. (N. Y.) 434; 72 Ill. 401; 73 Ill. 200; 11 Gray (Mass.), 140; 101 Mass. 381; 4 Clifford, 544; 21 How. (U. S.) 441; 13 N. Y. 611; 17 N. Y. 596; 34 N. Y. 30; 36 N. Y. 200; 34 How. Prac. (N. Y.) 338; 32 Barb. (N. Y.) 76; Field on Corp. § 270, note 2; *Ib.* § 253; 46 N. Y. 479; 101 U. S. 81; 54 Ala. 473; 41 Miss. 494; *Ib.* 737; 1 Chan. Div. L. R. (English) 247; 2 Chan. Div. App. (English) M. P. 714; 1 Beas. (N. J.) 133. The following authorities discussed and distinguished: In *re*

*Evans,* 2 Ch. App. Cases, L. R. 427; *Sanger v. Upton,* 95 U.
S. 665; *Abbott v. Aspinwall,* 26 Barb. (N. Y.) 202. (4) Under
its Alabama organization, the corporation was foreign to the
State of Mississippi, and had no right to exercise its franchises
in that State, except on such terms as that State chose to pre-
scribe.—*Morris v. Hall,* 41 Ala. 510; *Liverpool Ins. Co. v.
Mass.* 10 Wall. 566; *Ducat v. Chicago,* 10 Wall. 410; *Paul v.
Virginia,* 8 Wall. 168. (5) Said company, as to the Mis-
sissippi stock and as to the Mississippi subscribers thereto, was
a Mississippi corporation, having no legal corporate connection
with the Alabama corporation other than such as results from
having the same individuals as officers for each, and being thus
under one general management, with separate local manage-
ments.—2 Wait's Act. & Def. 311–13; 28 Conn. 298; 1 Sum-
ner, 61; 1 Black, 297; 13 Peters, 588; 14 Peters, 129; 12 Wall.
82; 13 Wall. 283; 41 Ala. 510; Field on Corp. §§ 128–30; 35
Miss. 25; Ang. & Ames on Corp. §§ 11, 78; 12 Gratt. 655.
No particular form of words is necessary to create a corporate
body, if the legislature plainly gives to an association of persons
perpetual succession, individuality to an artificial creation, as
distinct from its changing members, and the power to conduct
business. This amounts to Chief Justice Marshall's definition
of a corporation. These capacities constitute a franchise, be-
stowed by the legislature, and a corporation is the result. (6)
The certificates of stock issued to the appellees being absolutely
void, they are entitled to have their notes canceled, and to be
repaid the moneys obtained from them fraudulently for this
over issued stock.—*N. Y. & N. H. R. R. Co. v. Schuyler,* 34
N. Y. 49; *Thomas v. City of Richmond,* 12 Wall. 356; *Mor-
ville v. Am. Tract Society,* 123 Mass. 129; *Utica Ins. Co. v.
Cadwell,* 3 Wend. 296; *P. W. & B. R. R. v. Quigley,* 21 How.
(U. S.) 209. (7) The assignment to Clark was void, because
it was contrary to the public policy of this State.—Cons. 1875,
Art. 14, § 5; Code of 1876, §§ 2027–8, 2030, 2054–62; Ang.
& Ames on Corp. pp. 165–6; 44 Penn. St. 535; Field on Corp.
§ 468; 2 Wait's Act. & Def. 313, art. 2; 101 U. S. 71. It
was void for the further reason that the business of life in-
surance companies can not be wound up by a voluntary assignee,
there being no machinery known to the law of assignments for
the benefit of creditors, by which the assignee can protect, or
deal with the interests of those holding policies of insurance on
their lives for the benefit of those who are otherwise strangers
to the contract of insurance, except that they are the benefici-
aries therein. That under the the advice of the ablest corpora-
tion lawyers of England and America, no company has until
now ventured on such an expedient, though its simplicity,
cheapness and subserviency to the interests of the company

making the assignment are obvious, is very persuasive of the non-existence of the legal power to make such an assignment. *Buck v. P. & A. Life Ins. Co.*, 10th number of Federal Reporter, vol. 4, for January, 1881, p. 849.    See also *Brashear v. West,* 7 Peters, 608; Ang. & Ames on Corp. (4th Ed.) § 191.  (8) But if the assignment is valid, the assignee does not represent creditors otherwise than the corporation could.—11 Ala. 880; 10 Paige, 211; Thom. on Liab. of Stock. § 147, note 2; 44 Maine, 273; 29 Conn. 385.    (9)    The appellees' bill has equity. It seeks a rescission of contracts of subscription, and for repayment of moneys obtained from them on void contracts.    The grounds of relief are frauds common to all.    The only differences are differences in attendant circumstances.    A bill in equity, by some for themselves and all others similarly situated, is proper for the aspect of rescission and cancellation.—*Mc-Bride v. Lindsay,* 9 Hare, 573; *N. Y. & N. H. R. R. Co. v. Schuyler,* 17 N. Y. 592; s. c. 34 N. Y. 30; *Ashmead v. Colby,* 26 Conn. 287; *Stainback v. Fernley,* 9 Simon, 557; *Seddon v. Connell,* 10 *Ib.* 59.    See also on the equity of the bill, Field on Corp. § 320, note 2; Story's Eq. Plead. § 97, note 4; 5 Allen, 375; 23 Ala. 559; 26 Conn. 290; 3 Swan. (Eng. Ch.) 74.    (10)    Other questions, not passed on or referred to in the opinion, also elaborately discussed.

BRICKELL, C. J.—The proposition underlying the bill, in its principal aspect, is, that the amount of the capital stock having been fixed and stated in the declaration of incorporation, when the company was formed, all of which had been subscribed for and taken, the company had not authority of law, at the time the subscriptions were made, and the promissory notes given, to enlarge the capital stock.    The enlargement was of consequence *ultra vires,* the stock could not be lawfully issued, and the subscriptions and notes are void for the want of consideration. Originally, the statute under which the corporation was formed, restricted the capital stock of corporations of this class to a sum not exceeding two hundred thousand dollars.    The restriction was removed by an act of the General Assembly, approved February 25th, 1871, and since, the corporators could, of their own option, fix the amount of the capital stock of the corporation they proposed to form.—Pamp. Acts, 1870–71, p. 18.    A prior statute conferred upon corporations which had been formed, or which might thereafter be formed, not having a capital stock of two hundred thousand dollars, authority to increase the stock to that sum.    The mode of making the increase was prescribed, and it was only in the event the mode was pursued, the increase was valid.—Pamph. Acts, 1869–70, p. 319.    The case has been argued, as if the bill negatived an increase of the capital stock

of the company in pursuance of the provisions of this statute. When a corporation relies upon a grant of power from the legislature to do an act, it is as much restricted to the mode prescribed by the statute for its exercise, as it is to the particular thing allowed to be done.—Ang. & Ames on Corp. § 111. If in the mode prescribed by the statute the capital stock was not increased, the statute would furnish no authority for the increase, and would not impart to the subscription and notes a validity or obligation not otherwise attaching to them.

It is apparent from an examination of the statutes, that the creation of corporations, under general laws, rather than by special legislative enactment, was not intended to work any essential change in their nature or character. Whether deriving existence from a special law, or from incorporation under the general law, the corporation is an artificial being of legislative creation, having no other powers or properties than such as the law confers, or which may be incidental to their very existence. The mode of incorporation the statutes have carefully prescribed. The persons proposing to be incorporated must file, and cause to be recorded in a designated public office, a declaration in writing, stating the name of the corporation, the objects for which it is formed, the amount of the capital stock, the number of shares into which it is divided, the names of the stockholders, and the number of shares each may hold. The office and the effect of the declaration the statutes do not leave in doubt—when recorded, the persons signing it, and their successors become a body corporate by the name stated therein, and with the powers conferred by law. It is an acceptance by the corporators, under the name designated, for the objects expressed, of the corporate powers and capacity the law confers, and a statement of the principal constituents of the corporation—the amount of the capital stock, the names of the stockholders, and the quantity of interest each has in the capital stock. There is no authority of law for introducing more into it, and if more be introduced, it is mere surplusage, not adding to, or detracting from the force of the declaration.

A controlling purpose, as we suppose, in authorizing or in compelling the creation of private corporations under general laws, is, to secure uniformity and equality of corporate powers, functions and privileges; that all corporations of the same class, formed for like purposes, should possess the same capacities and properties, and exercise and enjoy the same franchises and privileges. Unless it was intended to work a radical change in the nature and character of these artificial beings, the mere creations of the law, and to subvert the whole theory which had prevailed in reference to them, it can not have been contemplated that they should for themselves create power and privi-

leges by declaration or reservation, whether the declaration or reservation is expressed in the articles of incorporation, or in the constitution or by-laws ordained by the corporators for their government. Such declarations or reservations would soon become more liberal and diverse than was the liberality and diversity of the grants of corporate power by special legislative enactment, the evil it was intended to remove. Of every corporation formed under the general law, the law itself becomes the charter, defines and enumerates the powers which are to be exercised, the nature and extent of corporate franchises and privileges. The declaration of incorporation—the constitution and by-laws adopted for corporate government, do not form the charter, or define or enumerate the corporate powers. These are the acts of the corporators. The charter is the grant from the sovereign power of the State; and by that source only can be varied or enlarged. The expression in the declaration of incorporation, that it was the intention and privilege to increase the capital stock and number of shares whenever deemed proper and expedient, may have been intended merely to notify the original corporators and their successors that the intention existed. If intended for any other purpose, it was vain and nugatory; it did not authorize an increase of the capital at the mere will of the company, in such mode as it elected. The power must be found in the law from which corporate existence is derived, or must have been conferred by a subsequent law, the provisions of which were observed in the exercise of the power.

The statutes, in express terms, conferred on banking associations, road companies, and steamship companies, the power of increasing their capital stock. With the exception of the act of March 3, 1870, to which reference has been made, there was no statute applicable to all private corporations, expressly authorizing an increase of capital stock by the act of the corporation, until the statute of January 30, 1876, which now forms sections 2031–35 of the Code of 1876. The importance the General Assembly attached to such a change in the constitution of the corporation, is manifested by the care with which the mode of effecting it is prescribed. This statute was enacted subsequently to the making of these subscriptions, and it is obviously true, that this company never exercised or intended to exercise the power it confers.

The case, in this aspect, resolves itself into the simple inquiry, whether the company had the implied power to take subscriptions for stock, after the capital stock, as expressed in the declaration of incorporation, had been subscribed for and taken; in other words, had it the power at its own option to enlarge the amount of its capital stock and the number of its shares. Corporations, by the common law, could exercise not only the

powers expressly granted to them, but such implied powers as were necessary and proper to carry into effect the express powers, and such incidental powers as pertained to the purposes for which they were created. The statute in reference to the implied or incidental powers of corporations is expressed in terms more limited. "In addition to the powers enumerated above, and to those expressly given in its charter, no private corporation possesses, or can exercise any corporate powers except those necessary to the exercise of the powers thus given."—Code of 1876, § 2021. Whether it was intended to limit, modify or qualify, or simply to enunciate the rule of the common law, is not a material inquiry; it is certain it was not intended to enlarge or to extend it. The implied or the incidental powers corporations may rightfully exercise, never have been extended to changes in the constitution or membership of the corporate body, or changes of the purposes for which the corporation was created. They have been confined to such powers as would enable the corporation to exercise properly its express powers. Changes of the capital stock of corporations of this character involve changes in organization, and a displacement of the power and influence the original stockholders, or their legitimate successors are of right entitled to exercise in the election of officers, and in the general management of the corporate affairs and business. That corporations have not an implied power to effect such change—that it can be effected only by legislative sanction, seems to be settled. Green's Brice's *Ultra Vires*, 112; Thompson on Liability of Stockholders, § 115; *Lathrop v. Kneeland*, 46 Barb. 432; *Mutual Life & Fire Ins. Co. v. McElway*, 12 N. J. Eq. (1 Beasley), 133; *N. Y. & N. H. R. R. Co. v. Schuyler*, 34 N. Y. 30; *Railway Co. v. Allerton*, 18 Wall. 233; *Scovill v. Thayer*, 105 U. S. 143. In this last case, the corporation, as in this case, was formed under a general law, and of its own act, without legislative consent, attempted to increase its capital stock. The court said: "The attempt to increase the stock of the company beyond the limit fixed by its charter was *ultra vires*. The stock itself was, therefore, void. It conferred on the holders no rights, and subjected them to no liabilities."

A subscription for the stock of a company is a contract, and, like other contracts, must be supported by a consideration. The consideration upon which it rests, is the right secured by it of membership in the corporation, and the interests accruing from membership. When these are not secured, and can not legally result from the subscription, it is wanting in consideration, as are notes or other obligations which may be given for its payment.—*Scovill v. Thayer, supra.*

The purpose of the subscribers to the declaration of incor-

poration seems to have been the organization of numerous similar corporations in other States, and in the Territories, which they termed departments, all of which were to be united, and of which the corporation here formed was to be the central, controlling power. There seems to have been but little, if any, comprehension, of the limited power and capacity of the corporation it was possible to form under the general laws of this State; and that when formed it would be strictly a domestic corporation, subject to all the restraints and regulations the State, in pursuance of its own policy, had imposed, or might thereafter impose. The prevailing idea seems to have been, that the corporators, by declaration and resolution, and by articles introduced into the constitution they adopted, could create the powers of the corporation, and transfer such powers to the numerous organizations it was intended to introduce into other States. The legal impracticability of the plan must soon have been developed; but it is averred they obtained from the legislature of Mississippi the enactment of a statute in pursuance of it, a copy of which is exhibited with the original bill.

This act authorized the company to establish in that State one or more departments. But no department could be established, until citizens of the State had subscribed for and paid, or secured to the satisfaction of the president and general board of directors, a capital stock of one hundred thousand dollars; and the directors of each department were required to be citizens of the State. Upon the establishment of a department, it was declared, the corporation was to be regarded as a home company, and should be entitled to have and enjoy all the rights, privileges, immunities and exemptions of life insurance companies incorporated by the laws of Mississippi. Under this act a department was organized, and it may perhaps be inferred from the averments of the bill, that it was for the stock of the department, and not for the capital stock of the company in this State, the appellees were subscribers.

The effect of this act was not merely to license, or to enable the corporation formed in this State to transact business and exercise its powers in Mississippi. It is of far wider operation, and creates a corporation having the same name, and like franchises, as the corporation formed in this State, whenever there was an organization in pursuance of its provisions, a domestic corporation, in the words of the act, a *home company.* A corporation can have no legal existence beyond the territorial boundaries of the sovereignty by which it is created—it must dwell in the place of its creation, and can not emigrate to another sovereignty.—Ang. & Ames on Corp. § 104; *Bank of Augusta v. Earle,* 13 Peters, 519. In other sovereignties, upon such terms and conditions as the sovereign power may provide,

it may transact business within the scope of its powers. And it is said, there is no legal difficulty in the creation of a single corporation by the concurrent action of two or more States, nor of the creation of a corporation by one State, having as one of its constituents a foreign corporation.—*P. & W. R. R. Co. v. Maryland*, 10 How. 376; *Railroad Co. v. Harris*, 12 Wall. 65; *Bishop v. Brainerd*, 28 Conn. 289. Whether only terms and conditions are prescribed, upon which a foreign corporation is permitted to exercise its faculties—whether there is concurrent action of two or more States in the creation of a single corporation, or whether a domestic corporation is created, is a question of legislative intent. All the books agree, that no particular form of words or expressions is essential to the creation of a corporation. — Ang. & Ames on Cor. § 76; *Thomas v. Dakin*, 22 Wend. 69. If the legislative intention is manifested clearly, to clothe an association of persons with rights, privileges and powers, to be enjoyed and exercised by a collective name, and for designated purposes, and in a corporate capacity, the association, by implication, is a corporation.—Ang. & Ames on Cor. § 78. The department organized in Mississippi had its own constituents, differing essentially from the constituents of the corporation formed in this State; its own capital stock, and its own powers and capacities, and for it there was to be a governing body, who were to be citizens of that State. The intention to confer corporate privileges and capacity, not merely to license a foreign corporation to transact its business and exercise its powers within the State, is plainly designated. There may have been a purpose, that of the domestic corporation thus formed, the corporation of this State should be a constituent, and that some undefined relations should exist between the two corporations. The purpose does not change the scope, operation and effect of the act. When there was an organization in pursuance of its provisions, a corporation existed, having its own capital, its own members, its own domicil, its own governing body; and its corporate powers were derived not from a foreign power, or by reference to the powers a foreign power may have conferred on a corporation of its creation, but were the rights, privileges, immunities, and exemptions of life insurance companies incorporated under the laws of Mississippi. The act, when accepted, when there was an organization under its provisions, became a contract between the State and the corporators. The contract was not with Alabama, but with Mississippi, and could not be rescinded or impaired, unless, by the law of the State, the power of rescission or alteration was reserved. The Constitution of this State reserved to the General Assembly the power of repealing, modifying, or altering at pleasure the general laws under which the corporation was

formed in this State. If the power had been exercised, it can not be supposed the corporation existing under the law of Mississippi would have been affected. It is not necessary to pursue the argument. All that can be said, is, that a corporation was created in Mississippi, having the same name, and for the same purposes, as the corporation formed in this State; but the two were distinct legal entities, and the act of incorporation of each was confined in operation to the territorial limits of the sovereignty from which it proceeded.—Ang. & Ames on Corp. § 164.

The character of the assignment to Clark, or the purposes for which it was executed, are not shown by the bill. The averment is, that it was executed by the corporation formed in this State, and conveyed all of the books, papers, notes, assets and effects of the corporation. There is a further averment that Clark holds and claims the exclusive right to collect the notes made by the appellees for the payment of their subscriptions for stock. The case has been argued by counsel, as if it appeared that the assignment was a general assignment for the benefit of creditors, executed in consequence of the insolvency of the corporation. The power of the corporation to make such an assignment in the event of its insolvency, is a grave question, upon which it is not now necessary for us to express an opinion. Whatever may be the true character of the assignment, it was inoperative to pass property, rights of property, or choses in action, to which the assignor had not title. If it be true, the subscriptions of the appellees were for the stock of the Mississippi corporation, the notes of the appellees, unless they had been negotiated to the corporation in this State, did not pass by it. Clark, as the assignee under a general assignment for the benefit of creditors, succeeds only to the rights of the assignor—he is bound and affected by all the equities, and subject to all the defenses which would have affected the assignor. In no just sense is he a purchaser for value, or the representative of creditors.—Burrill on Assignments, 538; *Walker v. Miller*, 11 Ala. 1067.

In either of its aspects, the case, as presented, seems to us strictly of legal cognizance. The demands are legal, the subjects of suits at law, and whatever of defenses are disclosed are legal. To make these defenses available, no discovery is sought, nor is there a necessity for it. There has been in this court a rigid adherence to the principle, that when a court of law is competent to take cognizance of rights, and has power to proceed to a judgment affording complete justice and full protection to the parties, a court of equity will not interfere. There can be no necessity for its interference, for its remedial process and function. The interference would involve a con-

fusion of the jurisdictions of legal and equitable tribunals, and would deprive parties of the right of trial by jury.—*Sadler v. Robinson*, 2 Stew. 520 ; *Knotts v. Tarver*, 8 Ala. 743 ; *Dickinson v. Lewis*, 34 Ala. 643 ; *Youngblood v. Youngblood*, 54 Ala. 486.

A court of equity has jurisdiction to decree the rescission of written instruments, the delivery up and cancellation of deeds, of covenants, of bonds, bills, or notes. It was said by Ch. Kent, in *Hamilton v. Cummings*, 1 Johns. Ch. 523, the exercise of the jurisdiction should be regulated by a sound discretion, as the circumstances of the individual case may dictate. A resort to the jurisdiction, to be sustained, must be expedient "either because the instrument is liable to abuse from its negotiable nature, or because the defense, not arising on its face, may be difficult or uncertain at law, or from some other special circumstances peculiar to the case." The subscriptions for stock are not negotiable, nor, so far as appears from the bill, are the notes, given for their payment. If the notes were negotiable there was evidently no reason to apprehend their negotiation ; nor was there reason to apprehend a delay of suit until there was a loss of evidence to sustain the defense. The case, as shown by the bill, is wanting in any special circumstance rendering the preventive jurisdiction of a court of equity necessary. In any other case of contracts in writing, void for want of consideration, or which may have been induced by fraudulent representations, or which may be wrongfully claimed by a party having possession of them, there would be the same reason as in this case, for equitable interference. It is better that in cases of this kind, of simple executory contracts for the payment of money, in the absence of some special necessity for equitable interference, the parties, having purely legal defenses should be remitted to a court of law to assert them.—*Ins. Co. v. Bailey*, 13 Wall. 616.

The error of the chancery court is, in not sustaining the demurrer resting upon the objection, that the appellees had in a court of law a plain and adequate remedy.

Reversed and remanded.