ADAMS *et al. v.* CHATTANOOGA Co., *Limited.*

(*Knoxville.* September Term, 1913.)

1. **CORPORATIONS.** Foreign corporations. Licensing of foreign corporations.

A foreign corporation doing business in the State under foreign corporation statutes (Acts 1877, ch. 31; Acts 1891, ch. 122; Acts 1895, ch. 81), requiring the filing of the charter with the secretary of State and the procurement of a license, is not a new entity, distinct from the foreign organization, and is domestic only as to property and acts within the jurisdiction. (*Post, p. 515.*)

Acts cited and construed: Acts 1877, ch. 31; Acts 1891, ch. 122; Acts 1895, ch. 81.

Cases cited and construed: Coke & Coal Co. v. Steel Co., 123 Tenn., 428, 442; Ohio & Miss. R. Co. v. Wheeler (Ind.), 297; Young v. Iron Co., 85 Tenn., 189; Grangers' Life Ins. Co. v. Kemper, 73 Ala., 325; Memphis, etc., R. Co. v. Alabama, 107 U. S., 581; St. Louis R. Co. v. James, 161 U. S., 545; Southern R. Co. v. Allison, 190 U. S., 326; Blake v. McClung, 172 U. S., 239; Blake v. McClung, 176 U. S., 60; McClung v. Embreerville Co., 103 Tenn., 399; Sully v. American Nat. Bank, 178 U. S., 289.

2. **EQUITY.** Pleading. Practice.

Every reasonable presumption should be exercised in favor of a bill when assailed by demurrer. (*Post, p. 519.*)

Cases cited and approved: Edwards v. Schillinger, 245 Ill., 231; Clark v. Mutual, etc., Assn., 14 App. D. C., 154; State v. North American, etc., Co., 106 La., 632; Williston v. Mich., etc., R. Co., 13 Allen (Mass.), 400; Smith v. Mutual, etc., Co., 14 Allen (Mass.), 336.

Cases cited and disapproved: Smith v. St. Louis, etc., Ins. Co., 3 Tenn Ch., 502; Smith v. St. Louis, etc., Ins. Co., 74 Tenn., 664.

3. **CORPORATIONS.** Foreign corporations. Dissolution. Jurisdiction of courts.

A court of chancery will not dissolve a foreign corporation domesticated in the State, where all of its assets are in a foreign jurisdiction, regardless of its authority to act, for its decree would be unenforceable. (*Post, p.* 520.)

4. **CORPORATIONS.** Dissolution. Foreign corporations.

Shannon's Code, secs. 5187, 6103, 6104, respectively declaring that a corporation is not dissolved by the nonuser or assignment of its powers and franchises, unless all its property has been appropriated to the payment of its debts, and any creditor or stockholder may file a bill to attach the corporate property, and have it applied to the payment of debts, and to have any surplus divided among the stockholders, and that in such cases the court may appoint a receiver, and take an account of the affairs of the corporation, and satisfy the debts, and divide the surplus, if any, apply not only to domestic corporations but to foreign corporations, and under them a court of chancery may dissolve a foreign corporation as to its property within the jurisdiction. (*Post, p.* 522.)

Code cited and construed: Secs. 3431, 4294, 4295 (T. & S. and 1858); Secs. 5187, 6103, 6104 (S.).

Case cited and approved: O'Connor v. Knoxville Hotel Co., 93 Tenn., 708.

5. **CORPORATIONS.** Dissolution. Right to dissolve.

Complainants and others joined in forming a British corporation, chartered to acquire land and the stock of any companies owning land or doing business in Tennessee, to take or otherwise acquire stock in any company engaged in business which it was authorized to carry on, and to sell, hold, reissue, or otherwise deal with such stock and securities. The British corporation, which was formed to take over large tracts of land in Tennessee, did not develop them, but sold them to other corporations, receiving the shares of those companies in part payment. *Held* that, as it was not insolvent, and as the holding of such stocks

Adams v. Chattanooga Co.

was within its charter powers, complainant stockholders were not entitled to dissolution, under Shannon's Code, sec. 5187, declaring that a corporation is not dissolved by the nonuser or assignment in whole or in part of its powers, franchises, and privileges, unless all of the corporate property has been appropriated to the payment of debts. (*Post, pp.* 522, 523.)

6. **CERTIORARI. Review. Moot cases.**

In a suit to dissolve a corporation and distribute its assets, where the preferred stockholders were not before the court, it is improper for the court to construe the charter in relation to the rights of the preferred and common stockholders; that being a moot question not presented by the record. (*Post, p.* 524.)

Cases cited and approved: Kimball v. Kimball, 174 U. S., 158; Taylor v. Insurance Co., 97 Va., 60.

---

FROM HAMILTON

---

Appeal from the Chancery Court of Hamilton County to the Court of Civil Appeals, and by *certiorari* from the Court of Civil Appeals to the Supreme Court.—M. M. ALLISON, Special Chancellor.

T. D. YOUNG and COLEMAN & FRIERSON, for plaintiff.

THOMAS & THOMAS, for defendant.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

The bill of complaint in this cause was filed by complainant Adams and others, as the owners of about 8,000 shares of a total issue of 60,000 shares of the common or ordinary shares of the Chattanooga Com-

pany, Limited, against that company, two other corporations as vendees of that company, and the Chattanooga Savings Bank. A demurrer filed to it was sustained by the chancellor. The bill is lengthy and somewhat involved, and it is more than ordinarily difficult to succinctly state the contents, due in large measure to the fact that general allegations in the body of the bill are in several instances modified or refuted by more detailed recitals of corporate records exhibited with the bill and prayed to be treated as parts thereof.

So far as material to the disposition of the errors assigned in this court, the bill may be said to contain allegations as follows:

Complainants were formerly holders of blocks of the preferred stock of the Chattanooga Land, Coal, Iron & Railway Company, predecessor of the defendant Chattanooga Company, Limited. The predecessor company issued $1,300,000 of mortgage bonds, upon which it defaulted. The bonds were held by residents of Great Britain. Pending a sale in foreclosure, the bondholders and the holders of the preferred stock entered into a reorganization agreement, by the terms of which it was stipulated that a new corporation should be organized, under the laws of Great Britain, to acquire the mortgaged estates at such sale, the capital stock of the new corporation to be issued in two classes: 12,000 of six per cent. preferred shares of twenty-five shares each, and 60,000 common shares of five each, the preferred shares to go to the bondholders, and the

Adams v. Chattanooga Co.

common shares to go to the preferred stockholders, of the insolvent company—complainants and others. It was recited in the reorganization agreement that "the condition of preference is that the preferred shares shall receive principal and interest at six per cent. before anything is paid upon common shares, and that the preferred shares shall thereafter rank as common shares."

The Chattanooga Company, Limited, accordingly was organized and acquired the mortgaged estates, and its capital stock was so distributed. After holding the properties for about nineteen years (during which practically nothing was done towards developing its lands for profit), defendant company sold and conveyed 12,000 acres of its holdings to defendant Durham Coal & Iron Company, receiving as consideration $120,000 in cash, $300,000 in the seven per cent. preferred stock, and $150,000 in the common stock of this vendee corporation. The entire remaining realty of the company, 8,000 acres was conveyed to the defendant Chattanooga Estates Company in consideration of $200,000 in cash, $1,000,000 in the preferred stock, and $1,300,000 in the common stock of this vendee corporation; the total consideration received in the two transactions being $3,000,000 in cash and stocks.

The charter of the Chattanooga Company, Limited, was prepared by or at the instance of the preferred stockholders in Great Britain, and provided for the lodgment of the voting power in the preferred stock until that stock was, by payments made, reduced to the

level of the common stock. A copy of the British char-
ter was filed and registered in the State of Tennessee
in compliance with our foreign corporation laws, and
thereby the corporation became domesticated in this
State, and it is by complainants alleged, became a dis-
tinct corporation in, and under the laws of this State.

As to the *locus* of the assets of the company:. It is
alleged that the Chattanooga Company, Limited, has
"no property or assets in England or elsewhere, sav-
ing and excepting the lands in Hamilton county, Ten-
nessee;" that the defendant Chattanooga Savings
Bank, located in Hamilton county, "has for a long
time been, and is now, the financial agent and deposi-
tory of the company, and, as such, now has in its pos-
session a large amount of cash notes, accounts, and
various stocks and bonds belonging to said defendant
company," which the bill seeks to impound; that "said
cash proceeds from the sale of said lands have been
unlawfully distributed *pro rata* among the preferred
stockholders" as interest on their shares of stock.

Touching the place or places where the company's
business was transacted: The city of Chattanooga
"was the place of the principal office and business
headquarters of said company in the state of Tennes-
see, where it kept its books, conducted all its business
transactions, and kept and used its corporate seal."
The principal officers and directors all lived in Great
Britain, where corporate meetings were held.

The charter of the Chattanooga Company, Limited—
memorandum and articles of association under the

Companies Acts of Parliament 1862 to 1890—provided that the objects of the company were, among others:

To purchase and otherwise acquire land and other properties in America and the capital or other stocks of any companies owning property or doing business in Tennessee.

To enter into and carry into effect, as the company may determine, any agreements for the purchase or acquisition of the properties or stocks so acquired.

To take or otherwise acquire stock, shares, and securities of any company carrying on, engaged in, or about to carry on or engage in any business or transaction which this company is authorized to carry on or engage in, or any business or transaction capable of being conducted so as directly or indirectly to benefit this company, and to sell, hold, reissue, or otherwise deal with such stock, shares and securities.

To sell the undertaking of the company, or any part thereof, for such consideration as the company may think fit, and, in particular, for shares, debentures, or securities of any other company having objects altogether, or in part, similar to those of this company.

To issue preference shares and ordinary shares, and to attach to said preference shares and ordinary shares such preferential, deferred, or special rights, privileges, or conditions as may be determined by, or in accordance with, regulations of the company.

The bill charges in general terms that the Chattanooga Company, Limited, is insolvent; but its exhibits show in detail that the company is solvent, and

its solvency was properly assumed by the solicitors of the complainants in their arguments in this court.

It is alleged that the company, upon the sale of said lands to the purchasing companies, "ceased to do any business, to use its franchises, or to be a going concern;" but this is refuted by the corporate records exhibited, which show that the company was, in the exercise of its British franchises, proceeding to the transaction of business in course claimed by it to be regular. That business was being transacted in Great Britain by the company, complainants elsewhere in their bill allege.

It is charged that the directors purpose to hold the proceeds of the land sales, particularly the stocks of the vendee corporations, in the treasury, and not to distribute to the shareholders; that they further purpose arbitrarily and unjustly to favor the preferred shareholders in so doing, in this, that the six per cent., stipulated to be paid on the preferred stock, may accumulate thereon until in the end all claim of the common shareholders in the purchase-money fund is wiped out. It is further charged that the said fund is in no sense "earnings," and that only earnings may be applied, lawfully, in payment of interest on the preferred stock; that the payment so made out of the cash consideration sums is a diversion; and that any payments out of capital (such as the consideration cash and stocks) must be made to all shareholders *pro rata,* without preference as between the two classes.

Adams v. Chattanooga Co.

Complainants sue in behalf of all creditors and stockholders, and the prayer of the bill is that it be sustained as a general creditors' bill for impoundment of the assets, including the consideration stocks, for a receiver to take charge of the property, that an account be taken to ascertain the rights of creditors and stockholders, and for general relief.

The bill of complaint was demurred to on grounds to be later indicated rather than formally stated; the demurrer was sustained by the chancellor, whose decree was affirmed by the court of civil appeals. The cause is before this court on writ of *certiorari.*

The errors assigned by complainants are two in number.

1. The court of civil appeals was in error in holding that the courts of Tennessee have no jurisdiction to wind up the affairs of the defendant company, at the instance of stockholders, because it has been domesticated in Tennessee, and it fairly appears from the bill that all its assets are in Tennessee.

2. That court was in error in holding that the bill does not allege such facts as would warrant a court of equity, at the instance of stockholders, in winding up the defendant corporation and distributing its assets, because (1) it appears that the original scheme is now impossible of consummation; (2) such nonuser and assignment to others of the powers and franchises of the corporation are alleged as entitle complainants to relief under our statutes; (3) the complainants are entitled to a distribution in specie under the charter; (4)

128 Tenn. 33

the bad faith of those in control in holding the stocks in the treasury until all interest of the common stockholders shall be consumed, by diversion of funds, entitled complainant to the relief sought; and (5) the corporation was organized to do business in Tennessee, and with intention that its property should be located here, and that by the sale of its realty, and the attempt to withdraw the consideration sums to Great Britain, the company has abandoned its corporate business.

There arises for determination, under these assignments of error, the question whether a court of equity of this State will assume jurisdiction of a proceeding to wind up the defendant corporation on the grounds set forth in the bill of complaint.

This, in turn, involves a consideration of the *status* and nature of this defendant as a corporation complying with and domesticated under the provisions of our foreign corporation statutes. Acts 1877, ch., 31; Acts 1891, ch. 122; Acts 1895, ch. 81.

It was held by this court, in *Coke & Coal Co.* v. *Steel Co.*, 123 Tenn., 428, 442, 131 S. W., 988, 991 (31 L. R. A. [N. S.], 278), that the result of the first-named act, as amended by the two last named, was in effect a legislative pronouncement that such corporations shall be "deemed and taken to be corporations of this State, the said corporations may sue and be sued in the courts of this State, and shall be subject to the jurisdiction of the State as fully as if created under the laws of Tennessee."

The insistence of complainants is that, under these statutes and the decisions based thereon, a distinct and separate corporate entity was created in this State when the Chattanooga Company, Limited, complied with the law by filing its charter in the proper office in this State—a corporation so far dissociated from the British entity as that it may be wound up in a Tennessee court in all respects as could a corporation originally chartered under the laws of this State, without reference to the *status* or condition of the foreign entity.

The true concept, as indicated by our decisions, based upon the statutes referred to, appears to us to be that a corporation so domesticated becomes, not a new and distinct entity, but only a corporation of this State *quoad hoc* any property and acts within its jurisdiction. *Ohio & Miss. R. Co.* v. *Wheeler* (Ind.), 1 Black, 297, 17 L. Ed., 130; *Young* v. *Iron Co.*, 85 Tenn., 189, 197, 2 S. W., 202, 4 Am. St. Rep., 752; 19 Cyc., 1204. It differs essentially from such corporations as were under consideration in *Grangers' Life Ins. Co.* v. *Kamper*, 73 Ala., 325, and *Memphis, etc., R. Co.* v. *Alabama*, 107 U. S., 581, 2 Sup. Ct., 432, 27 L. Ed., 518, which were corporations with distinct incorporators, stock issues, or directors, in the respective domesticating States.

The doctrine now is that "one State may make a corporation of another State, as thus organized and conducted, a corporation of its own, as to any property in its territorial jurisdiction. Illustrations of

these conclusions are now seen every day in the passage by States of enactments making foreign corporations doing business within the domestic jurisdictions domestic corporations, and amenable in all respects to the domestic laws and police regulations, notwithstanding the provisions of their foreign charters. But it remains equally true that, for many purposes of legal procedure and practical convenience in the administration of justice, each one of the bodies so created remains a domestic corporation within the State under whose legislature it has been called into existence. Clearly, such a corporation is a domestic corporation within each of the States whose legislation has created it, for the purpose of local jurisdiction to the application of local police regulation. Such a corporation is a resident of each of such States, for the purpose of the ordinary jurisdiction of its courts." 10 Cyc. 170, 171; 5 Thomp. Corp. (2 Ed.), sec. 6629.

This court, in *Coke & Coal Co. v. Steel Co.,* supra, cited and quoted opinions of the supreme court of the United States in support of the ruling there made that it was competent for a State to make a foreign corporation complying with its legislative acts so providing a domestic corporation, and commented, without disapproval, on the statement of limitation in *St. Louis R. Co. v. James,* 161 U. S., 545, 16 Sup. Ct., 621, 40 L. Ed., 802, that such domestication was "in regard to property and acts within the territorial jurisdiction," and also on the ruling in the *James Case* to the effect that a domestication of a corporation, after the

manner of that involved in this case, left outstanding or remaining in the State of its creation, an entity, of citizenship foreign to the domesticating jurisdiction, so to be treated in that jurisdiction for certain purposes indicated. The supreme court of South Carolina held the same way touching a corporation which had been made, in like manner, a domestic corporation of that State. *Calvert* v. *Railway Co.*, 64 S. C., 155, 36 S. E., 750, 41 S. E., 963, affirmed 187 U. S., 636, 23 Sup. Ct., 844, 47 L. Ed., 343. To the same effect is the later case of *Southern R. Co.* v. *Allison,* 190 U. S., 326, 23 Sup. Ct., 713, 47 L. Ed., 1078, wherein Mr. Justice Peckham, for the court, stated a distinction between a domestication, such as herein appears, and that form of domestication of a corporation which was considered in *Memphis, etc., R. Co.* v. *Alabama,* supra, and said that, ''by reason of the language used in the Alabama act, there was a separate original Alabama corporation formed, which made it a corporation created as well as controlled by the State of Alabama.''

That the defendant Chattanooga Company, Limited, became a domestic corporation *quoad hoc,* and not for all purposes as a wholly separate and unrelated entity, is further shown by the fact that by our Acts 1891, sec. 5, above cited, provision is made that, when a complying foreign corporation has no agent in this State upon whom process may be served, its property may be attached as that of a nonresident, thus affirmatively showing that the legislature did not conceive or intend that compliance should *ipso facto* work a creation of

a distinct body politic, and work a loss to the corporation of residence or citizenship in the State of its creation.

In *In re Standard Oak Veneer Co.* (D. C.), 173 Fed., 103, that able jurist, Judge Sanford, sitting in the United States district court in this State, held that a foreign corporation, so complying with our foreign corporation acts did not become a resident of this State, where the corporation retained its principal office in the State of creation, and its presented claim was based upon transactions conducted through such foreign office, so far forth as to be entitled to the priority awarded to creditors who are resident in Tennessee in the distribution of the assets of a foreign corporation itself also domesticated in this State under the cited statutes. Notwithstanding compliance and consequent domestication, it was held that the claimant corporation remained also a resident of the State of its creation, and, as such, was constitutionally to be denied its claim of right to share in priority, under the rulings in *Blake* v. *McClung,* 172 U. S., 239, 19 Sup. Ct., 165, 43 L. Ed., 432; *Blake* v. *McClung,* 176 U. S., 60, 20 Sup. Ct., 307, 44 L. Ed., 374, overruling *McClung* v. *Embreeville Co.,* 103 Tenn., 399, 52 S. W., 1001, and *Sully* v. *American Nat. Bank,* 178 U. S., 289, 20 Sup. Ct., 935, 44 L. Ed., 1076.

In *Young* v. *Iron Co.,* supra, it appeared that the city of Chattanooga was by the Iron Company's by-laws made the general office of the company; that all of its books, including its stock books and seal, were

there kept; that all of its officers resided there; the meetings of stockholders and directors were held there, where also was its plant and corporate property of every kind. It was held that, while a foreign corporation in one sense, that company, in view of its corporate acts, was to be deemed a domestic corporation as far forth as to give *situs*, for attachment of its shares of stock, in this State. There the "acts within the territorial jurisdiction" went to the extent of drawing even corporate *situs*, for the indicated purpose, into this jurisdiction as the place of the true home office of the corporation. Fact was allowed to overrule legal fiction. But it was not meant to be there ruled that every corporation which complies with our acts acquired, by virtue of that fact, *situs* for stock attachment purposes.

On the basis, therefore, of the defendant company being treated as a corporation domesticated only for purposes of jurisdiction in respect of property and transactions in this State, we have next for consideration whether a court of equity in this State will assume jurisdiction in a case where, as here, the corporation is not insolvent, at the instance of stockholders, to wind up the corporation on any ground stated in the bill of complaint.

Under the familiar rule that the court should make every reasonable presumption in favor of the bill of complaint when assailed by a demurrer, we are of opinion that the complainants must be taken to allege

that the undistributed assets of the defendant company are in this State.

Counsel of defendant company insist that the bill shows otherwise, and in accord with the truth, that the assets sought to be impounded are in Great Britain. If this appeared, or were made to appear, then we would have for further consideration whether a court of equity in this State, regardless of any question of potential jurisdiction over the defendant as a domestic corporation, would decline to assume or exercise jurisdiction. This, on the ground that, the governing officers and the property to be affected being out of the State, the court could render no effective decree, and would leave the claimants to seek their remedy in the jurisdiction where the corporation was created. *Edwards* v. *Schillinger,* 245 Ill., 231, 91 N. E., 1048, 33 L. R. A. (N. S.), 895, 137 Am. St. Rep., 308; *Clark* v. *Mutual, etc., Ass'n,* 14 App. D. C., 154, 43 L. R. A., 390; *State* v. *North American, etc., Co.,* 106 La., 632, 31 South., 172, 87 Am. St. Rep., 309; *Williston* v. *Mich., etc., R. Co.,* 13 Allen (Mass.), 400; *Smith* v. *Mutual, etc., Co.,* 14 Allen (Mass.), 336; 19 Cyc., 1238, 1345.

Manifestly, as to the phase of insolvency, our cases which relate to the winding up, at the instance of Tennessee claimants, of insolvent foreign corporations (*Smith* v. *St. Louis, etc., Ins. Co.,* 3 Tenn. Ch., 502; Id., 6 Lea, 564, and cases in accord) are aside. We have here no such case, whether the principal defendant be deemed a domestic or a foreign corporation for that assumed purpose.

But a phase of the decisions in the last-cited case is relied on by complainants in support of their contention that a court of equity will award to a resident stockholder, even in a foreign corporation, relief of winding up its affairs, so far as assets within the State are concerned, in a proper case. Code, Shannon's, provides (as did the Code of 1858, in sections 3431, 4294, and 4295) as follows:

"Sec. 5187. A corporation is not dissolved by the nonuse or assignment to others, in whole or in part of its powers, franchises, and privileges, unless all the corporate property has been appropriated to the payment of its debts, and any creditor, for himself and other creditors, whether he has recovered judgment or not, or any stockholder, for himself and other stockholders may file a bill under the provisions of this chapter, to attach the corporate property, and have such property applied to the payment of the debts of the corporation, and any surplus divided among the stockholders."

"Sec. 6103. The creditors of a corporation may also, without first having obtained a judgment at law, file a bill in the court of chancery, to attach the property of the corporation, and subject the same, by sale or otherwise, to the satisfaction of their debts, when the corporate franchises are not used, or have been granted to others in whole or in part.

"Sec. 6104. In such cases the court may appoint a receiver, take an account of the affairs of the corporation, and apply the property and effects to the pay-

ment of debts *pro rata,* and divide the surplus, if any, among the stockholders.''

In the case last cited the statute was construed to apply to creditors of a foreign corporation as well as a domestic corporation, and this, whether the effort of the creditors was to base their remedy on insolvency of the coropration or on its having ceased to do business and to use its franchise.

Chancellor Cooper said: ''The argument is that the provisions of our Code—sections 3431, 4294, 4295 (Shannon's, secs. 5187, 6103, 6104)—apply to domestic corporations, and the property of foreign corporations is left to be seized by the more diligent claimants under other provisions of the law. . . . Both the statutes and the decisions speak of corporations, without drawing any distinction between domestic and foreign corporations, and the principle of the decisions, as shown by the authorities cited, is manifestly based on the nature of corporations and corporate funds generally. And it would be a curious departure from uniformity, so desirable in the administration of law, to hold that a different measure of justice should be meted out to creditors, dependent upon whether their debtor was a domestic or foreign corporation. Most clearly there is nothing in the language of the Code or the decisions to give countenance to the distinction contended for.'' 3 Tenn. Ch., 504, 505.

By parity of reasoning, the quoted sections of the Code sustain an action of like character on the part of stockholders there named along with creditors.

Complainants insist that they have presented a proper case for the winding up of the. company and a distribution of its assets; their prime contention being that the original scheme of the coventurers is now impossible of consummation, and has been definitely abandoned. They urge that the object of the corporation was to acquire and develop land in Hamilton county; that practically no development had been made and no profits had been earned, in consequence of which the lands had been sold, and the scheme abandoned. This contention takes no note of the alternative provisions of the charter, stipulating that the company might "sell its. undertaking, or any part thereof, for such consideration as the company may think fit, and, in particular, for shares . . . of any other company having objects altogether, or in part, similar to those of this company," or of the further provision that the company shall have power "to hold or otherwise deal with stock or shares." The bill of complaint shows that the governing body of the company is, in pursuance of this feature of the British franchise, proposing to hold the consideration stocks, thus carrying on the business. There is therefore no nonuse of that franchise. Complainants invested in the enterprise by taking shares in the British entity under the British charter, and they cannot validly urge that a discontinuance of the use of any feature of the franchise from this State touching the ownership and control of land here, acquired on or after domestication, gives them a right to treat, or have treated, the

enterprise as abandoned, and the company wound up.
The case of *O'Connor v. Knoxville Hotel Co.*, 93 Tenn.,
708, 28 S. W., 308, urged on us, manifestly is no au-
thority for the contention that this enterprise is, on
these facts, impossible of consummation.

Having failed, first, to show insolvency, and, as just
demonstrated, to show discontinuance of the business
of the corporation and nonuse of its franchises, in
neither aspect of the code section quoted above (Code,
Shannon, sec. 5187) do complainants make out a case
for the winding up of the affairs of the company.

All other matters assigned as error do not fall with-
in the purview of the bill of complaint and the prayer
for relief. No relief by way of injunction or otherwise
is asked in respect of what are claimed to be *ultra vires*
acts of the directors in Great Britain in respect to the
payment of dividends on the preferred stock, to com-
plainants' prejudice.

An effort is also made in this court to convert the
bill into one for a construction of the charter in rela-
tion to the rights of the preferred stockholders and
the common stockholders, respectively, in a distribu-
tion of assets on dissolution; but, since there is a fail-
ure to show grounds for winding up, and the holders
of preferred stock are not before the court, no such
issue arises for solution on the record. As said by the
supreme court of the United States: "The duty of
this court, as of every judicial tribunal, is limited to
determining rights of persons or of property, which
are actually controverted in the particular case before

it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it." *Kimball* v. *Kimball,* 174 U. S., 158, 19 Sup. Ct., 639, 43 L. Ed., 932; *Taylor* v. *Insurance Co.,* 97 Va., 60, 33 S. E., 385, 45 L. R. A., 621, 627.

The demurrer to the bill was properly sustained, and the decree of the court of civil appeals is affirmed.